148 P.3d 493

STATE of Hawai'i, Plaintiff–Appellee,

v.

Gilbert O. HICKS, Defendant–Appellant.

No. 27566.

Supreme Court of Hawai'i.

Dec. 7, 2006.

**62**

Stuart N. Fujioka (of Nishioka & Fujioka), on the briefs, for defendant-appellant.

Christopher D.W. Young and Marcus B. Sierra, Deputy Attorneys General, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

**Opinion of the Court by MOON, C.J.**

Defendant-appellant Gilbert O. Hicks [hereinafter, Hicks or the Defendant] appeals from the October 11, 2005 judgment of conviction and probation sentence of the Circuit Court of the First Circuit, the Honorable Richard W. Pollack presiding, adjudicating Hicks guilty of and sentencing him for the offense of sexual assault in the third degree, in violation of Hawai'i Revised Statutes (HRS) § 707–732(1)(e) (Supp.2005), quoted *infra*. Briefly stated, Hicks—a former youth correctional officer at the Hawai'i Youth Correctional Facility (the HYCF)—was charged with and convicted of sexual assault for grabbing the testicles of a minor who was committed to the HYCF [hereinafter, Complainant]. Hicks was subsequently sentenced to five years' probation subject to certain conditions.

On appeal, Hicks challenges the trial court's denials of his (1) oral motion for judgment of acquittal made at the close of plaintiff-appellee State of Hawaii's (the prosecution) case-in-chief and (2) motion for new trial or judgment of acquittal made after the verdict was rendered. Hicks maintains that there was insufficient evidence that the HYCF is a "state correctional facility" and that Complainant was "an imprisoned person," as required by HRS § 707–732(1)(e). Specifically, Hicks argues that the HYCF—a correctional facility under the jurisdiction of the Office of Youth Services within the Department of Human Services—does not fall within the phrase "state correctional facility," which term encompasses only adult prisons and correctional facilities under the supervision of the Department of Public Safety and that, therefore, Complainant cannot be said to be "imprisoned." Additionally, Hicks requests for the first time on appeal a review of the sexual assault statutes "as they are either void for vagueness or otherwise violate [his] rights to due process" under the fifth and fourteenth amendments to the United States Constitution and article I, sections 5 and 14 of the Hawai'i Constitution. For the reasons set forth below, we affirm the trial court's October 11, 2005 judgment of conviction and probation sentence.

## I. BACKGROUND

On September 15, 2004, Hicks was charged by indictment with one count of sexual assault in the third degree. The indictment averred that:

> On or around the 18th day of January[ ] 2004, to and including the 23rd day of January[ ] 2004, in the City and County of Honolulu, State of Hawai'i, GILBERT O. HICKS, while employed in a state correctional facility, did knowingly subject to sexual contact, [Complainant], an imprisoned person, by placing his hand on [Complainant]'s scrotum, thereby committing the offense of Sexual Assault in the Third Degree, in violation of [HRS §] 707–732(1)(e)[.]

HRS § 707–732 provides in relevant part:

> **Sexual assault in the third degree.** (1) A person commits the offense of sexual assault in the third degree if:
>
> . . . .
>
> (e) The person, while employed:
>
> (i) *In a state correctional facility;*

(ii) By a private company providing services at a correctional facility;

(iii) By a private company providing community-based residential services to persons committed to the director of public safety and having received notice of this statute;

(iv) By a private correctional facility operating in the State of Hawai'i; or

(v) As a law enforcement officer as defined in section 710–1000(13), *knowingly subjects to sexual contact an imprisoned person, a person confined to a detention facility, a person committed to the director of public safety, a person residing in a private correctional facility operating in the State of Hawai'i, or a person in custody, or causes the person to have sexual contact with the actor* [.]

. . . .

(2) Sexual assault in the third degree is a class C felony.

(Bold emphasis in original.) (Underscored emphases added.) It is undisputed that, at the time of the offense, Complainant was a minor housed at the HYCF and that Hicks was a Youth Correction Officer (YCO) employed by the HYCF.

*A. The Trial*

A four-day jury trial began on July 12, 2005. Witnesses testifying for the prosecution consisted of, *inter alia,* a YCO, several former HYCF wards,[1] the HYCF's head nurse and staff physician, a YCO and Internal Affairs Investigator, and Complainant. Hicks testified in his defense.

**1. Testimony of the Prosecution's Witnesses**

On July 14, 2005, Complainant[2] testified as to the incident that formed the basis of the underlying offense against Hicks:

Q. [By the prosecution:] I'd like to draw your attention to the week of January 18th to the 23rd of 2004; this week, January 18 to the 23rd, 2004.

During that week, were you housed in Module B?

A. [By Complainant:] Yes.

Q. Did you experience any painful incidents that week?

A. Yes.

Q. Where did it happen?

A. In—when we was [sic] lining up for go back to school, in the module.

Q. You were inside the module?

A. Yes.

Q. Okay. Do you—approximately what time was it that it happened?

A. About 12:05 or 12:10.

Q. Okay. Is this the normal time that you line up to go back to school?

A. Yes.

Q. And who was there? What staff members were in the module at the time?

A. Mr. Hicks.

Q. Just Mr. Hicks?

A. Yes.

Q. Where were the other wards?

A. Waiting in line, too.

Q. How did the incident start?

A. We has, like, a verbal conflict, like, talking about—he told me to grab his dick or his balls and I told him to grab mine; and, like, a while after, he came up to me and grabbed mine and grabbed my—my balls and my dick and twisted it and—

Q. It started with him telling you to grab his dick or his balls?

A. Yeah.

Q. Was he speaking just to you or was he speaking to everyone?

A. Just to me.

Q. Just to you?

A. Yes.

---

1. Minors housed at the HYCF are referred to as "wards."

2. Complainant testified that he spent a total of approximately six months in the HYCF between the age of fourteen or fifteen and eighteen. Ap- parently, the HYCF consists of three modules—A, B, and C. Complainant stated that he had lived in all three modules; at the time of the offense, however, he was housed in Module B.

Q. Was he looking directly at you?

A. Yes.

Q. What did you think he was—what did you think his meaning was when he said that?

A. I['m] not too sure. He has his mind of his own. I['m] not really—

Q. You weren't sure what he meant?

A. Yeah. I wasn't sure what he meant.

Q. Any idea why he would say this to you?

A. No.

Q. Was he expressing any emotion at the time that he said it to you?

A. Laughing.

Q. Laughing. Okay. So when you heard him say this, what did you say back to him?

A. Say—what did I say back to him? "Why don't you grab my balls or dick."

. . . .

Q. . . . And why did you say this back to him?

A. We was [sic] just joking. I thought we was [sic] just joking.

. . . .

Q. Okay. You just said it back—

A. Just for laugh, you know.

Q. Okay. But what did he do immediately after you said that?

A. He walked up to me and grabbed my balls and my dick and twisted it.

Q. How close were the two of you before—before he walked up to you?

A. Maybe, like, two feet away.

Q. So how many steps did he take to—before he grabbed you?

A. I['m] not too sure.

. . . .

A. Maybe, like, two steps.

Q. Two steps. How did he grab you?

A. He grabbed me with his right hand and twisted it up toward the right, like clockwise kind.

Q. Did he grab you through your clothing?

A. Yes.

When asked whether he tried to defend himself during the incident, Complainant responded negatively, stating that he did not touch Hicks "[b]ecause it would have been wrong for me to hit a YCO, and I could have gotten in trouble for that."

Three former wards of the HYCF, who were present at the time of the incident, testified to the event between Hicks and Complainant. They all testified to observing Hicks grabbing Complainant's testicles while they were standing in line in Module B to return to school in the afternoon. Further, HYCF head nurse, Linda Hadley, testified that she examined Complainant and observed Complainant's right testicle to be "swollen, red, and [that he was in] lots of pain." HYCF staff physician, Dr. Robert Bidwell, also testified that he conducted "a medical history" of Complainant—not a physical examination—and, in his opinion, the injury was consistent with the explanation Complainant gave of having his testicles grabbed and twisted.

The testimony of YCO Cathy Jean Kaleo Marciel, who has been employed at the HYCF for six years, revealed that the duties of a YCO consisted of "security[,] custody and control of wards." She explained that:

[The wards] are troubled youths that have been sentenced to prison and—that's basically what it is. They're in jail, and I'm a correctional officer for the youth.

Marciel further stated that:

[A YCO] can be assigned to a module [or] . . . to Central Control. And—well, if you're in the module, you normally take the kids to school.

. . . .

Central Control is the heart of our facility. It opens and closes doors and—it's our security area.

. . . .

[Central Control contains] four monitors [or] five monitors that view the different modules, outside, inside, on the streets. It's all cameras that we have within different parts of the facility.

. . . .

[B]esides watching the monitors, [YCOs assigned to Central Control] release and—

[ ] open and close doors and watch where everyone's going. That's their job.

She described the morning routine in the modules as "what normally we do, the routine is we open up each cell door and we wake them up, tell them, go ahead and clean your room."

When asked whether the HYCF is a state correctional facility and whether Complainant was "a minor imprisoned at HYCF," Marciel answered "yes" to both inquiries. Hicks did not object to the questions or the answers. Marciel then described the conversation she had with Complainant the morning of January 29, 2004 when she observed Complainant "holding his groin area":

A. [By Marciel:] And, so, I said, "What's wrong?" And he said, "I'm sorry. I gotta see the nurse." I said, "Well, when did this happen?" He goes, "I don't know."

I said, "Did you—" I asked him if he saw the nurse last night, and he said yeah. And I said, "Well, just wait for her to come up this morning." You know, that's normal for them. You know, they see the nurse twice a day, two or three times a day.

Q. [By the prosecution:] Did you ask him why he was hurting in that area?

A. Yes, I did.

Q. What did he tell you?

A. He said that "My balls are sore."

And I said—I said, "What?" And he said, "Yeah. Hicks grabbed my balls." And I said, "What?" And then he said, Oh, it was out of playing, or—

Marciel testified that she believed Complainant was hurting because "[h]e was walking real slow." She also stated that she was assigned by her supervisor to take Complainant to the hospital to get checked. Marciel indicated that she "placed shackles" on Complainant before transporting him to the hospital and, at the hospital, she had to be near Complainant at all times, right outside the examination curtain.

Another YCO and Internal Affairs Investigator, Henry Bell Haina, Jr., testified that he was assigned to investigate the case of misconduct involving Hicks and Complainant by the youth facility administrator Kaleve Tufono–Iosefa. When asked whether Complainant was "imprisoned at [the] HYCF back in January of 2004," Haina answered in the affirmative. Haina testified that he narrowed the specific date as to when the incident occurred to January 21, 2004 by reviewing

the reporting of the incident; the statement of [Complainant] as to how long he was in pain and the time element between it and the reporting to Cathy Marciel and the medical unit; going back and looking at sign-in sheets and figuring out when Mr. Hicks was on duty [in Module B].

As previously testified by Marciel, Haina explained that there are four cameras in each module and one outside the door for a total of five cameras for each module. Using the January 29, 2004 videotape of Module C, entered as State's exhibit 7, Haina further described what each camera looks at, including the YCO desk and the inside of the entrance door to the module. Haina, however, testified that the January 21, 2004 videotape was not preserved.

On cross-examination, the following colloquy occurred:

Q. [By the defense counsel:] Your assignment—or you were assigned by Ms. Kaleve Tufono–Iosefa?

A. [By Haina:] Yes, sir.

Q. And she was the—she's the administrator?

A. Youth Facility Administrator.

Q. YFA?

A. Yes, sir.

Q. And she's also used the word "warden" interchangeably.

A. For everyday conversation's sake[,] you could call her the warden. She is the top person at the facility.

Q. But perhaps "YFA" is the more correct term, more accurate term?

A. That is the actual title.

. . . .

Q. Who is Ms. Iosefa accountable to? Is there someone above her?

A. Yes, sir, Sharon Agnew, the executive director.

Q. Executive Director of Youth Services?

A. Yes, sir.

Q. And she oversees not just the youth correctional facility, but other—I guess, other programs within the office of Youth Services; correct?

A. Yes, sir.

Q. And Agnew is accountable to [the] Director of Human Services?

A. I believe so.

Through the testimony of the prosecution's witnesses, the prosecution admitted as exhibits, *inter alia,* photographs of the secured cell doors within Module B and the January 29, 2004 video of Module C, showing the wards in orange prison type uniforms lined up at the security door in front of Hicks, who was dressed in a YCO uniform.

## 2. Motion for Judgment of Acquittal

At the close of the prosecution's case, Hicks orally moved for judgment of acquittal:

Your Honor, the [prosecution] having completed its evidence, the defense moves for judgment of acquittal. They have not established a prima facie case. Specifically, they need to prove that [Complainant] was imprisoned. The [HYCF] is under the jurisdiction of the Department of Human Services, not the Department of Public Safety, and I don't think it's been established that the [HYCF] is a prison, such that [Complainant] was in prison at the time of the alleged incident. So we would submit there's been a failure—there should be judgment in favor of the defense.

In response, the prosecution argued that:

Our argument is that we did establish that, that one witness in particular testified directly to that issue, that he is an imprisoned minor at [the] HYCF. I believe there's more than one witness, Your Honor, that testified to that effect. There's no requirement that we bring in someone from the Department of Human Services or the Department of Public Safety to say that. It doesn't say that we have to have anyone in particular testify to that. And, so, it may go to weight if he wants to argue that he's not imprisoned; but it certainly

doesn't, at this stage in the proceedings, constitute a lack of prima facie proof.

Thereafter, the trial court orally denied the motion for judgment of acquittal, stating that:

Looking at the evidence in the light most favorable to the government and drawing a favorable inference thereto, the [c]ourt believes a prima facia [sic] case has been established.

## 3. Hicks's Testimony

On July 14, 2005, Hicks testified that he has been working as a YCO at the HYCF since 1980. In January 2004, Hicks stated that he worked in Module B and typically worked the midnight shift; however, on January 21, 2004, he worked from 6:00 a.m. to 2:00 p.m. Hicks, however, denied any contact with Complainant on January 21, 2004:

I[, *i.e.,* Hicks] have a recollection that it[, *i.e.,* January 21, 2004,] was a normal day. The—I can't say it was anything out of the ordinary that particular day. The wards lined up for school; I did my head counts; they went to school; they came back[.]

When asked whether he remembered Complainant specifically during his shift, Hicks responded that:

He was in the module; but I don't remember personally, like, How you doing, [Complainant]? Because that was the first—he was new to me that day. That was the first time I had seen [Complainant] in that month. If he had been there earlier, I don't remember.

Hicks maintained that January 21, 2004 was the only time he saw Complainant because it was the only day in January that he worked the day shift.

Moreover, Hicks described the scene on the January 29, 2004 videotape, in which he claimed that he was the person being harassed:

As you can see [from the video], the wards—the wards come back to bother me, to say things to me, to—they know I can't physically touch them and all I can do is give them a day suspension. So, Hey— this and that. They can say almost anything they want, and they do that to get

into your head, to bother you, to make you do things. Basically, I just ignore it.

Okay. As you can see right there (indicating), same—same—the same view. The wards have to—this is what you call a safe area, and they are standing on the outside of the square. So, in case of a code red or seeing where I'm attacked, which is called a code red, someone opens that door and let—and lets me out. That's why, if you notice, I haven't left that area.

On cross-examination, Hicks was asked whether it was true that, if a ward touches a YCO in an offensive manner, he can be disciplined. Hicks answered that "[t]hey're already in jail."

### 4. The Verdict

On July 15, 2005, the trial court instructed the jury. The relevant instruction was based on HRS § 707–732(1)(e) and the definition of "sexual contact" set forth in HRS § 707–700 (Supp.2005):

> The [D]efendant, Gilbert Hicks, is charged with the offense of Sexual Assault in the Third Degree. A person commits the offense of Sexual Assault in the Third Degree if he, while employed in a state correctional, knowingly subjects to sexual contact an imprisoned person.
>
> There are four material elements of the offense of Sexual Assault in the Third Degree, each of which the prosecution must prove beyond a reasonable doubt. These four elements are:
>
> 1) That on or about August 18th, 2004, to and including January 23rd, 2004, in the city and county of Honolulu, state of Hawai'i, the [D]efendant subjected [Complainant] to sexual contact; and
>
> 2) That the [D]efendant did so while [Complainant] was imprisoned; and
>
> 3) That the [D]efendant did so while the [D]efendant was employed in a state correctional facility; and
>
> 4) That the [D]efendant did so knowingly.
>
> Sexual contact means any touching, other than acts of sexual penetration, of the sexual or other intimate parts of a person not married to the actor or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

That same day, the jury returned its verdict, finding Hicks guilty of sexual assault in the third degree.

### B. *Motion for New Trial or Judgment of Acquittal*

On July 25, 2005, Hicks filed a motion for new trial or judgment of acquittal (motion for new trial), pursuant to, *inter alia,* Hawai'i Rules of Penal Procedure (HRPP) Rules 29 (motion for judgment of acquittal) and 33 (motion for new trial) (2005). Hicks maintained that the prosecution had not proven every element of the offense; specifically, Hicks argued that the prosecution did not present substantial evidence that Complainant was an imprisoned person. Hicks contended that a juvenile ward of the Department of Human Services is not a "prisoner" in the custody of the Department of Public Safety:

> It is not disputed that [a]dult prisons and correctional facilities are under the jurisdiction of the Department of Public Safety. The [HYCF], where [Complainant] was confined, falls under the jurisdiction of the Office of Youth Services within the Department of Human Services.

On August 17, 2005, the prosecution filed its memorandum in opposition, arguing that substantial evidence was adduced that Complainant was imprisoned at the HYCF, pointing specifically to Marciel's testimony that the HYCF is a state correctional facility and that Complainant was a minor imprisoned at the HYCF. The prosecution further asserted that:

> The rules of statutory construction indicate that the undefined phrase, "imprisoned person," must be read to bear its common, ordinary or usual meaning. *See* HRS § 1–14. According to Merriam Webster's Collegiate Dictionary, 9th edition and the American Heritage On-line Dictionary, "imprison" means "to put in or as if in prison; confine." According to Random House Webster's Dictionary, 3rd edition, page 362, "imprison" means "to

confine in or as if in a prison." None of these common, ordinary and usual meanings of "imprison" can be interpreted to exclude juvenile inmates confined in a youth correctional facility. Nor do these common, ordinary and usual meanings of "imprison" draw a distinction between the confinement of adults under the Department of Public Safety and the Confinement of children under the Department of Human Services.

Statutory construction rules also dictate that undefined words should not be given meanings that lead to absurdity or inconsistency. The penetration statute, HRS § 707–731 "sexual assault in the second degree," contains the same language in issue. It would be absurd to believe that the legislature intended to punish guards for sexual penetration and sexual contact with adults confined in a correctional facility like [the O'ahu Community Correctional Center] under the supervision of the Department of Public Safety, but to allow guards to have sexual penetration and sexual contact with juveniles confined in a correctional facility like [the] HYCF under the supervision of the Department of Human Services. This absurd result would be inconsistent with the overall statutory scheme for sexual offense, which evidences a strong legislative intent to provide more, not less, protection for minors against sexual offenders.

(Citations omitted.)

On August 18, 2005, the trial court held a hearing on the motion for new trial, at the conclusion of which the court, persuaded by the prosecution's arguments, orally denied the motion. A written order was filed on September 2, 2005. In so doing, the trial court entered the following findings of fact (FOFs) and conclusions of law (COLs):

### FINDINGS OF FACT

1. The [p]rosecution, in its case at trial, presented witnesses who testified that the [HYCF] is a "state correctional facility" and that [Complainant] was a ward, confined and imprisoned at [the] HYCF at the time of the offense.

2. The testimony and evidence presented by the Defense, in its case at trial, did not dispute these facts.

### CONCLUSIONS OF LAW

1. The specific language of the Indictment alleges that the Defendant, while employed in a state correctional facility, did knowingly subject to sexual contact, [Complainant], an "imprisoned person."

2. The phrase "imprisoned person" is not defined in the statute or in any other relevant part of the Hawai'i Penal Code.

3. Where the statute does not provide a legal definition for a word or phrase, the court must look to its common, ordinary or usual meaning.

4. Merriam Webster's New Collegiate Dictionary, 10th edition, defines the word "imprison" as "to put in or as if in prison; confine."

5. There was ample and substantial evidence that [Complainant] was a "confined' person at a state correctional facility and was held "in or as if in prison."

6. The language on the face of HRS § 707–732(1)(e)(i) does not support the Defendant's legal argument that the phrase "imprisoned person" applies only to adults confined in a state correctional facility under the jurisdiction of the Department of Public Safety.

7. HRS § 707–732(1)(e)(i) states that a person commits the offense of sexual assault in the third degree if the person, while employed in a state correctional facility, knowing subjects to sexual contact an imprisoned person, a person confined to a detention facility, a person committed to the director of public safety, a person residing in a private correctional facility operating in the State of Hawai'i, or a person in custody, or causes the person to have sexual contact with the actor.

8. There is nothing in the language of HRS § 707–732(1)(e)(i) that indicates a legislative intent to exclude from the meaning of "imprisoned person" a ward confined or imprisoned in a state correctional facility, like [the] HYCF.

9. Even if the [c]ourt were to accept the Defendant's argument that the distinctions between adult criminal proceedings and juvenile delinquency proceedings create an ambiguity as to whether a juvenile can be considered an "imprisoned person," any potential ambiguity is resolved by HRS chapter 352, entitled "Hawai'i Youth Correctional Facilities."

10. HRS § 352–2.1(a) states, "[t]his chapter creates within the department of human services and to be placed within the office of youth services under the supervision of the director and such other subordinates as the director shall designate, the Hawai'i youth correctional facilities, in order to provide for the *incarceration*, punishment, and institutional care and services to reintegrate into their communities and families children committed by the courts of the State."

11. Merriam Webster's New Collegiate Dictionary, 10th edition, defines "incarceration" in essentially the same way it defined "imprison," that is, "to put in prison; to subject to confinement."

12. It therefore appears clear that notwithstanding any differences between adult criminal and juvenile delinquency proceedings, the legislature views juveniles confined to a youth correctional facility as incarcerated or imprisoned persons.

13. It would also be incongruous to interpret HRS § 707–732(1)(e)(i) in a manner that provides incarcerated adults with protection against sexual assault by correctional officers but denies the same protection to incarcerated children.

(Emphasis and brackets in original.)

### C. Judgment of Conviction and Probation Sentence

On October 10, 2005, Hicks was sentenced to five years' probation subject to certain conditions, including a ninety-day jail term to be served on weekends in alternating increments beginning Friday or Saturday. The judgment of conviction and probation sentence was filed the next day. On October 24, 2005, Hicks timely filed his notice of appeal with the circuit court.[3]

## II. STANDARDS OF REVIEW

### A. Motion for Judgment of Acquittal

■ The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. An appellate court employs the same standard of review.

*State v. Maldonado*, 108 Hawai'i 436, 442, 121 P.3d 901, 907 (2005) (citation omitted) (format altered).

### B. Motion for New Trial

■ "[T]he granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *State v. Yamada*, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005) (citation omitted). It is well-established that an abuse of discretion occurs if the trial court has "clearly exceed[ed] the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* (citation omitted).

■ Furthermore, at a hearing on a motion for new trial, the trial court acts as the trier of fact. *State v. St. Clair*, 101 Hawai'i

---

**3.** Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(b) (2005) provides in relevant part:

 (1) *TIME AND PLACE OF FILING.* In a criminal case, the notice of appeal shall be filed in the circuit, district, or family court within 30 days after the entry of the judgment or order appealed from.

 (2) *EFFECT OF POST-JUDGMENT MOTIONS.* If a timely motion in arrest of judgment under [HRPP] Rule 34 ... or for a new

trial under [HRPP] Rule 33 ... has been made, an appeal from a judgment of conviction may be taken within 30 days after the entry of any order denying the motion.

(Underscored emphases and capitalization in original.)

 Also, in his opening brief, Hicks indicates that he did not post bail pending appeal and is in compliance with all terms and conditions of probation.

280, 287, 67 P.3d 779, 786 (2003) (citation omitted).

In this jurisdiction, a trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed. And where there is substantial evidence, which is credible evidence of sufficient quantity and probative value to justify a reasonable person in reaching conclusions that support the FOFs, the FOFs cannot be set aside. Moreover, an appellate court will not pass upon issues dependent upon credibility of witnesses and the weight of the evidence; this is the province of the trial judge.

*Id.* (citations, internal quotation marks, and brackets omitted). A trial court's conclusions of law, however, are reviewed *de novo*, under the right/wrong standard of review. *State v. Kido*, 109 Hawai'i 458, 461, 128 P.3d 340, 343 (2006).

C. *Constitutional Questions*

 The constitutionality of a statute is a question of law, which is reviewed *de novo*, under the right/wrong standard. *State v. Friedman*, 93 Hawai'i 63, 67, 996 P.2d 268, 272 (2000). "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case." *Id.* (citation and internal quotation marks omitted).

D. *Statutory Interpretation*

 "The interpretation of a statute is a question of law reviewable *de novo*." *State v. Kalani*, 108 Hawai'i 279, 283, 118 P.3d 1222, 1226 (2005) (citation and internal quotation marks omitted). It is well settled that our foremost obligation when construing a statute

is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of

the entire statute and construe it in a manner consistent with its purpose.

*Id.* (citation omitted).

III. *DISCUSSION*

On appeal, Hicks argues that: (1) the prosecution failed to adduce sufficient evidence that the HYCF is a "state correctional facility" and that Complainant was an "imprisoned person," as mandated under HRS § 707–732(1)(e); and (2) the sexual assault statutes are unconstitutional. Accordingly, Hicks urges this court to reverse his conviction or remand for new trial. Each of Hicks' contentions is addressed in turn.

A. *Sufficiency of the Evidence*

This court has repeatedly announced that, when passing on the legal sufficiency of evidence to support a conviction,

evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Viglielmo*, 105 Hawai'i 197, 202–03, 95 P.3d 952, 957–58 (2004) (citations omitted) (format altered). "Substantial evidence" is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Pone*, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (brackets, internal quotation marks, and citations omitted).

Hicks maintains that the trial court erred in denying his oral motion for judgment of acquittal and his motion for new trial because the prosecution presented insufficient evidence that the HYCF is a "state correctional facility" and that Complainant was an "imprisoned person." Hicks specifically argues that "no representative of the facility administration or Department of Human Services testified to the character of the HYCF or legal status of the minor wards." Thus, Hicks asserts that "[c]haracterization of the

facility as a prison by lay employees and the wards does not suffice to establish that [Complainant] was imprisoned."

As quoted *supra,* HRS § 707–732(1)(e) provides that a person commits the offense of sexual assault in the third degree if:

(e) The person, while employed:

(i) *In a state correctional facility* [ ]

. . . .

... knowingly subjects to sexual contact *an imprisoned person,* a person confined to a detention facility, a person committed to the director of public safety, a person residing in a private correctional facility operating in the State of Hawai'i, or a person in custody, or causes the person to have sexual contact with the actor[.]

(Emphases added.)

### 1. The HYCF as a "State Correctional Facility"

Hicks appears to argue that the HYCF does not fall within the phrase "state correctional facility" because a youth correctional facility—like the HYCF—is separate and different from "the prison system." Hicks asserts that, "[i]n a juvenile facility[,] the focus is on rehabilitation." He also asserts that "[t]he Department of Public Safety controls jails and prisons while the Department of Human Services is responsible for juveniles." Accordingly, Hicks submits that "adult prisoners and juvenile wards" are not "the same for purposes of sexual assault." In other words, Hicks implicitly contends that only an adult state correctional facility under the supervision of the Director of Public Safety can be a "state correctional facility."

 The phrase "state correctional facility" is not defined anywhere in the Hawai'i Penal Code, *i.e.,* HRS chapter 701 to chapter 712A, including the pertinent definition section of HRS chapter 707, which contains the sexual assault statutes. Hicks, thus, urges this court to limit the meaning of the subject phrase essentially to only adult correctional facilities—and not juvenile facilities. Such restriction, however, is inappropriate in light of the "general principles of statutory construction" that "courts [are to] give words

their ordinary meaning unless something in the statute requires a different interpretation." *Saranillio v. Silva,* 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995) (citation omitted); *see also* HRS § 1–14 (1993) ("The words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning.")

 By its plain and obvious meaning, the phrase "correctional facility" undoubtedly encompasses youth correctional facilities. Absent from the Hawai'i Penal Code, including HRS § 707–732, is any language limiting the scope of the "correctional facility" to adult correctional facilities. In fact, in 2002 and 2004, the legislature expanded HRS § 707–732(1)(e) to include persons employed not only in state correctional facilities, but also to those employed

(ii) *By a private company providing services at a correctional facility;*

(iii) *By a private company providing community-based residential services to persons committed to the director of public safety* and having received notice of this statute;

(iv) *By a private correctional facility operating in the State of Hawai'i;* or

(v) *As a law enforcement officer* as defined in section 710–1000(13)[.]

HRS § 707–732(1)(e) (emphases added); *see* 2002 Haw. Sess. L. Act 36, § 2 at 107; 2004 Haw. Sess. L. Act 61, § 5 at 304. Specifically, the legislature stated that the purpose for the expansion of the statute was "to ensur[e] that sexual offenses committed by *any* correctional facility employee against inmates are prohibited, regardless of the employer," Sen. Stand. Comm. Rep. No. 2913, in 2002 Senate Journal, at 1403 (emphasis added), and "to provide[ ] needed protection to *persons under the custody of the state,*" Hse. Stand. Comm. Rep. No. 88, in 2002 House Journal, at 1268 (emphasis added). *See also* Sen. Stand. Comm. Rep. No. 3162, in 2002 Senate Journal, at 1509. Stated differently, the legislature's focus was on ensuring that the legislation covered employees of all correctional institutions intended to be included,

and not on defining strictly exclusive categories. Thus, the type of agency overseeing the youth correctional facility is not determinative as to whether the facility is a "correctional facility." It follows then that Hicks's argument that the HYCF is not governed by the Department of Public Safety does not exclude the HYCF from the phrase "correctional facility." Accordingly, by its ordinary meaning, we believe that the phrase "correctional facility" must be construed to include a youth correctional facility, such as the HYCF. However, the issue remains whether a youth correctional facility—specifically, the HYCF—is a *state* correctional facility.

HRS chapter 352, entitled "Youth Correctional Facilities," does not expressly provide that a youth correctional facility is a state correctional facility. Nonetheless, the legislature, in enunciating the purpose of the youth correctional facilities, clearly indicated that:

> (a) *This chapter creates within the department of human services, and to be placed within the office of youth services under the supervision of the director* [, *i.e.,* the executive director of the office of youth services,] and such other subordinates as the director shall designate, *the Hawai'i youth correctional facilities,* in order to provide for the incarceration, punishment, and institutional care and services to reintegrate into their communities and families, children committed by the courts of the State.

HRS § 352-2.1(a) (1993) (emphases added). HRS § 352-8 (1993 & Supp.2005) further provides in relevant part that "the director shall be the guardian of every youth committed to or received at the Hawai'i youth correctional facilities." Accordingly, inasmuch as HRS chapter 352 clearly mandates that youth correctional facilities be placed under the supervision of a Hawai'i agency, *i.e.,* the Department of Human Services, we hold, as a matter of law, that the HYCF is a *state* correctional facility.[4]

The dispositive issue, however, is whether there was credible evidence of sufficient quality and probative value to enable a juror of

reasonable caution to support a conclusion that Hicks was employed by the HYCF, which, as we have previously concluded, is a "state correctional facility." Hicks did not dispute that he was a YCO employed by the HYCF. Indeed, Hicks testified that he worked (1) as a YCO at the HYCF since 1980 and (2) in Module B on January 21, 2004 from 6:00 a.m. to 2:00 p.m. Thus, taking the evidence in the light most favorable to the prosecution, there was sufficient evidence to enable the jury to conclude that Hicks was employed "in a state correctional facility."

### 2. Complainant as an "Imprisoned Person"

Next, Hicks maintains that there was insufficient evidence to establish that a minor—in this case, Complainant—committed to the HYCF, is an "imprisoned person" because, in juvenile proceedings and juvenile facilities, the focus is on rehabilitation. Hicks again states that "[p]risons and [y]outh [c]orrectional [f]acilities are operated by separate department[s] of the [e]xecutive branch of government." He argues that a juvenile ward of the court is not a "prisoner":

> Wards in the HYCF are a separate class of individuals, as evidenced by the insistence of the Department of Human Services on referral to them as such, rather than as "inmates" or prisoners."

In response, the prosecution asserts that the plain reading of the phrase "an imprisoned person" as used in HRS § 707-732(1)(e) encompasses "juveniles confined to a youth correctional facility" because:

> It would be absurd to believe that the legislature intended to punish guards for sexual [contact] with adults in an adult correctional facility, but not to punish guards for sexual [contact] with juveniles confined in a youth correctional facility like [the] HYCF, simply because they fall under the supervision of a different State department. This absurd result would be inconsistent with the overall statutory scheme for sexual offenses, which evidences a strong legislative intent to pro-

---

4. In light of our holding *supra,* we need not address Hicks' argument that the prosecution

failed to present sufficient evidence showing that the HYCF is a state correctional facility.

vide more, not less, protection for minors against sexual offenders.

Further, the prosecution contends that, "[v]iewing all of the evidence in the strongest light for the prosecution and in full recognition of the province of the trier of fact, there was sufficient evidence from which a reasonable mind might fairly conclude that" Complainant was "an imprisoned person."

██ Like the phrase "state correctional facility," the word "imprisoned" is not defined anywhere in the Hawai'i Penal Code. Thus, the undefined word must be read to bear its common, ordinary or usual meaning. *Saranillio*, 78 Hawai'i at 10, 889 P.2d at 694; *see also* HRS § 1–14. The Webster Third New International Dictionary (1993) defines "imprison" as "to put in prison: *confine* in a jail." *Id.* at 1137 (emphasis added). Consequently, the issue before this court is whether there was substantial evidence to support the conclusion that Complainant was confined to the HYCF.

In the present case, the testimony of Marciel and Haina clearly support the conclusion

that Complainant was confined to the HYCF. For example, Marciel testified that her YCO job duties involved "security[,] custody and control of wards" and further explained that the wards are "troubled youths that have been sentenced to prison.... They're in jail, and I'm a correctional officer for the youth." Thus, the circuit court did not err in concluding that there was sufficient evidence for the jury to conclude that Complainant was confined and, therefore, "an imprisoned person." [5] Accordingly, the circuit court properly denied Hicks' oral motion for judgment of acquittal and motion for new trial.

### B. *Constitutionality of the Sexual Assault Statutes*

Finally, for the first time on appeal, Hicks contends that:

The sexual assault statutes are unconstitutional because they permit conviction of sex offense without any proof of sexual intent. All criminal convictions require proof of state of mind. *See* HRS § 702–204 [ (1993) [6]]. Sexual Assault in the Third

---

5. In support of his contention that juvenile wards are not prisoners and, therefore, are not "imprisoned person[s]," Hicks relied on three non-Hawai'i cases, *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *District of Columbia v. Jerry M.*, 717 A.2d 866 (D.C.App. 1998); and *State v. McBride*, 66 N.J. 577, 334 A.2d 27 (1975). OB at 20–22. We agree with the prosecution, however, that the three cases relied upon by Hicks do not indicate that a juvenile ward is not an "imprisoned person."

In *Kent*, the issue was, notwithstanding the social welfare philosophy and civil proceedings nature underlying the District of Columbia's Juvenile Court Act, whether the requirement of a "full investigation" by the family court judge prior to waiving a juvenile to adult court should be more broadly interpreted to include certain limited rights that adults have in criminal cases, such as the right to a hearing, the right to certain discovery and the right to written findings. 383 U.S. at 555–62, 86 S.Ct. 1045. The Supreme Court decided in the affirmative, essentially noting that the imprisonment of a juvenile is no less liberty depriving than the imprisonment of an adult. *Id.* at 554, 86 S.Ct. 1045. The court in *Jerry M.* was presented with a dispute over attorney's fee limitations in the District of Columbia's Prison Litigation Reform Act. Although the court discussed philosophical distinctions between adult criminal proceedings and juvenile delinquency proceedings based on the civil character and social welfare focus of their Juvenile Court Act, the appellate court pointed out that Con-

gress affirmatively amended the Act to replace the word "adult" with the word "prisoner," and then defined "prisoner" to expressly include juveniles adjudicated delinquent of crimes. 717 A.2d at 874. Lastly, the issue in *McBride* was whether the trial court was too harsh when it sentenced the defendant (who was eighteen and a half at the time of the offense) to concurrent terms of fifteen to twenty-two years at a state prison. 334 A.2d at 28. The defendant argued that, based on the traditional philosophy of rehabilitation rather than punishment for youthful offenders, he should have been sentenced to a youth facility for an indeterminate term. *Id.* The appellate court ultimately decided that the sentence was too long, but that the deterrence created by imposing a fixed minimum term of imprisonment in state prison was more important than the general desirability of placing the defendant in a youth facility. *Id.* at 29. The court, therefore, ordered that the defendant be sentenced to seven to twelve years in a state prison. *Id.*

6. HRS § 702–204 provides in relevant part that:

[A] person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense. When the state of mind required to establish an element of an offense is not specified by the law, the element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly.

Degree requires only knowing "sexual contact."[7] Most troubling is that sexual contact is defined merely as contact with the body parts associated with sex, there is no statutory requirement of sexual purpose, gratification or intent.

In other words, Hicks argues that the legislature should have drafted the "sexual contact" statute more narrowly to require proof of sexual intent, sexual purpose or sexual gratification and that, because it failed to do so, the statute is unconstitutional. Specifically, Hicks, directing this court to the exclusions in the text of Alaska's "sexual contact" definition statute,[8] asserts that Alaska's "sexual contact" definition "has survived" constitutional challenge "because of its attempt to proscribe only conduct which is sexual in nature." Hicks, thus, implies that Hawaii's definition of "sexual contact" would have been struck down by the Alaska court as unconstitutional. Accordingly, Hicks maintains that Hawaii's sexual assault statutes are unconstitutionally overbroad because "the scheme punishes an excessively broad range of conduct under the banner of sexual assault in violation of due process rights of [Hicks] and others."

■■■ "Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal." *State v. Hoglund*, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) (citing *State v. Cummings*, 49 Haw. 522, 423 P.2d 438 (1967)). Specifically, this court has held that

the question of the constitutionality of a statute cannot be raised for the first time on appeal. *State v. Tin Yan*, 44 Haw. 370,

355 P.2d 25 (1960). However, in cases where we have considered the constitutionality of a statute raised for the first time on appeal, we have done so on the ground that the constitutionality of the statute is of great public import and justice required that we consider the issue. *See, e.g., Fujioka v. Kam*, 55 Haw. 7, 514 P.2d 568 (1973); *Smith v. Smith*, 56 Haw. 295, 535 P.2d 1109 (1975).

*State v. Ildefonso*, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992).

[I]n the exercise of this discretion[,] an appellate court should determine whether the consideration of the issue requires additional facts, whether the resolution of the question will affect the integrity of the findings of fact of the trial court[,] and whether the question is of great public import.

*State v. Kapela*, 82 Hawai'i 381, 392 n. 4, 922 P.2d 994, 1005 n. 4 (App.1996) (internal quotation marks and citation omitted) (first set of brackets in original).

■■■ Although Hicks concedes that the constitutionality issue is raised for the first time on appeal, he contends, without more, that such does not make the issue unreviewable, citing *Kapela*. Although this court's consideration of the constitutionality of the sexual assault statutes would not (1) require additional facts or (2) affect the integrity of any factual findings of the trial court, we have considered the constitutionality of HRS § 707–700 on the grounds of vagueness or overbreadth, holding that the subject "statute is not unconstitutionally vague" because the definition of "sexual contact" is "crystal

7. "Sexual contact" is defined as

any touching, other than acts of "sexual penetration", of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

HRS § 707–700.

8. Alaska Statute § 11.81.900(b)(58) provides:

"[S]exual contact" means
(A) the defendant's
(i) knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast; or

(ii) knowingly causing the victim to touch, directly or through clothing, the defendant's or victim's genitals, anus, or female breast;
(B) but "sexual contact" does not include acts
(i) that may reasonably be construed to be normal caretaker responsibilities for a child, interactions with a child, or affection for a child;
(ii) performed for the purpose of administering a recognized and lawful form of treatment that is reasonably adapted to promoting the physical or mental health of the person being treated; or
(iii) that are a necessary part of a search of a person committed to the custody of the Department of Corrections or the Department of Health and Social Services[.]

clear." *State v. Richie*, 88 Hawai'i 19, 31–32, 960 P.2d 1227, 1239–40 (1998); *see also State v. Kalani*, 108 Hawai'i 279, 288, 118 P.3d 1222, 1231 (2005). As such, we decline to address Hicks' constitutional challenge. However, even if we were to conclude that the question present is of great public import, Hicks' argument—as demonstrated below—lacks merit.

■ Preliminarily, we note that, with the exception to statutes that create suspect classifications, "[e]very enactment of the Hawai'i Legislature is presumptively constitutional, and the party challenging a statute has the burden of showing the alleged unconstitutionality beyond a reasonable doubt." *State v. Bui*, 104 Hawai'i 462, 466, 92 P.3d 471, 475 (2004) (citation, internal quotation marks, and footnote omitted). In *Richie*, the defendant contended that his conviction of promoting prostitution in the second degree should be reversed because the definition of "sexual contact" was unconstitutionally vague and overbroad. 88 Hawai'i at 31, 960 P.2d at 1239. As previously stated, this court held that the subject "statute is not unconstitutionally vague" because the definition of "sexual contact" is "crystal clear":

> The statute establishes a bright-line rule, which in laypersons' terms can be summarized as: "You can look but you can't touch." This definition gives the person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. It also constitutes an explicit standard that avoids arbitrary and discriminatory enforcement and is not subjective.

*Id.* at 31–32, 960 P.2d at 1239–40. However, the *Richie* court recognized that

> [t]he doctrine of overbreadth, although closely related to a vagueness claim, is distinct in that while a statute may be clear and precise in its terms, it may sweep so broadly that constitutionally protected conduct as well as unprotected conduct is included in its proscriptions.

*Id.* at 32, 960 P.2d at 1240 (internal quotation marks and citation omitted). In that case, the defendant specifically argued that the constitutionally protected conduct infringed upon by the definition of "sexual contact"

was nude dancing. *Id.* This court nonetheless rejected the argument, holding that

> nothing in the definition of "sexual contact" in HRS § 707–700 prohibits nude dancing *per se*. Individuals are not prevented from dancing in the nude. The conduct prohibited is the touching of sexual or intimate parts. Thus, the statute still permits dancing in the nude and allows customers to *look* at performers dancing in the nude; what the customers cannot do is *touch* the performers.

*Id.* (emphases in original). The defendant then argued overbreadth by raising "extreme and patently absurd" examples, *i.e.*, contending that dance instructors, fashion designers, tailors, and even Santa Claus and the Easter Bunny could be prosecuted under the definition of "sexual contact." *Id.* This court responded:

> In reviewing a penal statute, we accord it a limited and reasonable interpretation in order to preserve its overall purpose and to avoid absurd results. [The defendant's] attempt to apply HRS § 707–700 to extreme and absurd situations is not sufficient to render it unconstitutionally overbroad.

*Id.* (ellipsis omitted).

In *Kalani*, the defendant was convicted of sexual assault by kissing a nine-year-old girl and inserting his tongue into her mouth. 108 Hawai'i at 281, 118 P.3d at 1224. On appeal, the defendant argued that, "if this court allows the definition of 'sexual and other intimate parts' to be broadened to include parts of the body not commonly associated with sexual relations, such as the mouth, tongue, hair, neck, shoulders, back and waist, the definition of 'sexual contact' will no longer be crystal clear." *Id.* at 287, 118 P.3d at 1230 (some internal quotation marks and brackets omitted). The court, however, rejected the defendant's contention, reasoning that the defendant had not established that a person of ordinary intelligence would not know that his conduct constituted sexual contact and, thus, failed to demonstrate that HRS § 707–700 is unconstitutionally vague with respect to his conduct. *Id.* at 288, 118 P.3d at 1231.

Here, Hicks has not demonstrated that the sexual assault statutes are unconstitutionally vague or overbroad with respect to his conduct. The sole basis of Hicks' challenge is his citation to Alaska's "sexual contact" definition statute. However, the difference between Alaska's definition statute and Hawaii's definition statute does not somehow render Hawaii's sexual assault statutes unconstitutional. Accordingly, Hicks has not shown beyond a reasonable doubt that the sexual assault statutes under which he was convicted are unconstitutional as applied to his conduct.

## IV. CONCLUSION

Based on the foregoing, we affirm the trial court's October 11, 2005 judgment of conviction and probation sentence.