277 P.3d 300

**STATE of Hawai'i, Respondent/Plaintiff–Appellee,**

v.

**Lloyd PRATT, Petitioner/Defendant–Appellant.**

**No. SCWC–27897.**

Supreme Court of Hawai'i.

May 11, 2012.

Daniel G. Hempey, for petitioner/defendant-appellant.

Tracy Murakami and Jake Delaplane, Deputy Prosecuting Attorneys, for respondent/plaintiff-appellee.

David Kimo Frankel and Ashley K. Obrey of the Native Hawaiian Legal Corporation, for amicus curiae Native Hawaiian Legal Corporation.

RECKTENWALD, C.J., NAKAYAMA, and DUFFY, JJ., with ACOBA, J., concurring and dissenting, with whom McKENNA, J., joins.

Opinion of the Court by NAKAYAMA, J.

Article XII, § 7 of the Hawai'i Constitution provides:

> The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Haw. Const. art. XII, § 7. Over the course of several cases, this court has interpreted this provision, along with statutory sources of protections, in order to define the scope of the legal privilege for native Hawaiians to engage in customary or traditional native Hawaiian practices when such practices conflict with State statutes or regulations. The court has examined the privilege in the civil context, considering the right to enter private land to gather traditional plants (*Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1, 656 P.2d 745 (1982)), the right to contest the State's sale of "ceded" lands (*Pele Defense Fund v. Paty* ("*PDF*"), 73 Haw. 578, 837 P.2d 1247 (1992)), and the right to participate in county-level Planning Commission hearings regarding land use (*Public Access Shoreline Hawaii v. Hawai'i County Planning Comm'n* ("*PASH*"), 79 Hawai'i 425, 903 P.2d 1246 (1995)). The court has also examined this privilege in the criminal context. In our most recent case on this topic, *State v. Hanapi*, 89 Hawai'i 177, 970 P.2d 485 (1998), we held that a criminal defendant asserting this privilege as a defense to criminal charges must satisfy, "at minimum", the following three-prong test: (1) the defendant must be "native Hawaiian" according to the criteria established in *PASH*[1], (2) the claimed right must be "constitutionally protected as a customary or traditional native Hawaiian practice," and (3) the conduct must occur on undeveloped property. *Id.* at 185–86, 970 P.2d at 493–94. In that case, we held that Hanapi had not satisfied this test, so the court's analysis stopped there. *Id.* at 187, 970 P.2d at 495.

Today's case picks up where *Hanapi* left off, and requires the court to articulate the analysis the courts must undertake when a defendant has made the "minimum" showing from *Hanapi*. The defendant in this case, Lloyd Pratt, received three citations[2] when he was found residing in a closed area of Nā

---

1. *PASH* defines "native Hawaiians" as "descendants of native Hawaiians who inhabited the islands prior to 1778[.]" *PASH*, 79 Hawai'i 425, 449, 903 P.2d 1246, 1270 (1995).

2. The three cases (numbers 27897, 27898, and

Pali State Park on the island of Kaua'i. Pratt filed a motion to dismiss the charges, asserting as a defense that his activities were constitutionally-protected native Hawaiian practices, and citing *Hanapi*. The District Court of the Fifth Circuit ("trial court") denied his motion [3], held trial, and subsequently found Pratt guilty on all three charges. Pratt appealed to the Intermediate Court of Appeals ("ICA"); the ICA affirmed Pratt's conviction. *State v. Pratt*, 124 Hawai'i 329, 243 P.3d 289 (App.2010). Pratt applied for a writ of certiorari, and we granted his application to clarify the law surrounding the assertion of native Hawaiian rights as a defense in criminal cases.[4]

## I. BACKGROUND

Pratt was cited for violating Hawai'i Administrative Rules ("HAR") § 13–146–4 on July 14, July 28, and September 28 of 2004, when he was found in a closed area of the Kalalau Valley in the Nâ Pali Coast State Wilderness Park on Kaua'i. HAR § 13–146–4, Closing of Areas, states in pertinent part:

> The board [of land and natural resources] or its authorized representative may establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof, when necessary for the protection of the area or the safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure. All persons shall observe and abide by the officially posted signs designating closed areas and visiting hours.

HAR § 13–146–4(a) (1999).

### A. Trial Proceedings

On September 21, 2005, Pratt filed a motion to dismiss arguing that the activity for

which he received his citations is constitutionally privileged as a native Hawaiian practice.[5] At a hearing on Pratt's motion, the defense presented two witnesses: Pratt, and Dr. Davianna Pomaika'i McGregor, a professor of Ethnic Studies at the University of Hawai'i, Mânoa. The prosecution presented one witness: Wayne Souza, the Parks District Superintendent for Kaua'i for the Department of Land and Natural Resources.

Pratt testified that he was born in Waimea to parents from O'ahu and the island of Hawai'i. He presented a family tree and testified that he is 75% native Hawaiian. Pratt named Kupihea as a family line, though that name does not appear on his family tree. The defense then presented its Exhibit 4, a book published by the State of Hawai'i called "An Archaeological Reconnaissance Survey: Na Pali Coast State Park, Island of Kaua'i." The book lists a land grant sold to the Kupihea family for part of the ahupua'a for the Kalalau Valley. Pratt testified that this is his family's land, and that this is where he spends time in the Park.

Pratt learned huna, which he described as a native Hawaiian "spiritual living style" from two elders. Pratt is a kahu, which he translated as a minister, healer, or medicine man. In addition to healing people, Pratt described his practice of healing land:

> It's actually putting back into order again. But it was there by my ancestors because it has mana [6] in it. It's to clean up the rubbish that is in there, meaning it broke up the mana that is on the heiaus [7], and especially because my ancestors are all buried on it. They're the caretakers to it.

Pratt testified that he has practiced such healing in the Kalalau Valley approximately

---

27899) were consolidated into one case.

3. The Honorable Frank D. Rothschild presided.

4. Pratt's application for writ of certiorari presented a second question regarding the binding effect of a concession on appellate courts. Because the court is able to decide the case without resolving that question, the question is not discussed.

5. In *Hanapi*, the court explained that "[t]he preferred method for a defendant to raise a constitu-

tional right in a criminal prosecution is by way of a motion to dismiss." *Hanapi* at 184, 970 P.2d at 492.

6. "Mana" means "Supernatural or divine power." Mary Kawena Pukui & Samuel H. Elbert, *Hawaiian Dictionary* 235 (rev. ed. 1986).

7. A "heiau" is defined as "a Pre–Christian place of worship, shrine; some heiau were elaborately constructed stone platforms, others simple earth terraces. Many are preserved today." Pukui & Elbert, *Hawaiian Dictionary* 64.

each month for over thirty years, and that he is responsible for the Kalalau Valley because his ancestors are buried there.

Pratt said that he takes offense when people say he "camps" in Kalalau Valley because he actually lives there. Pratt testified that he has to spend the night in the valley to fulfill his responsibilities because hiking in to the valley takes eight to ten hours, and he needs two days to recuperate from the difficult hike. The defense offered a photograph as its Exhibit 2, which shows the area where Pratt lived. Pratt explained that he cleared the area in the picture of trash, brush, and overgrown java plum trees, an invasive species that prevents native plants from growing. He planted hasu, watercress, bananas, and twelve coconut trees. Exhibit 2 shows several tarps, which Pratt said covered his living area; it also shows a green hose, which Pratt used to water his plants. Pratt said that he knew of a government program whereby a private citizen can work with the DLNR to take care of the parks; he unsuccessfully applied to work with this program in Kalalau Valley in the early 1990s.

Dr. Davianna Pomaikaʻi McGregor is a tenured professor at the University of Hawaiʻi where she teaches classes on Hawaiians, land tenure use in Hawaiʻi, race relations, and economic change in Hawaii's people. She has taught the course on Hawaiians since 1974. Dr. McGregor testified as an expert in the area of customary and traditional native Hawaiian practices, as well as the source of protection of native Hawaiian rights.

Through her research, Dr. McGregor has developed a list of the following six elements essential to traditional and customary native Hawaiian practices: (1) the purpose is to fulfill a responsibility related to subsistence, religious, or cultural needs of the practitioner's family; (2) the practitioner learned the practice from an elder; (3) the practitioner is connected to the location of practice, either through a family tradition or because that was the location of the practitioner's education; (4) the practitioner has taken responsibility for the care of the location; (5) the practice is not for a commercial purpose; and (6) the practice is consistent with custom. In preparation for her testimony, Dr. McGregor

interviewed Pratt and determined that his daytime activities in Kalalau Valley meet these requirements of a traditional and customary practice. She testified that Pratt's activities are subsistence-related because he planted food plants, that they are religious because he performs ceremonies on the heiau, and that they are cultural because he learned them from the previous generations. Based on her interview with Pratt, Dr. McGregor believed that Pratt's activities satisfied every element of her test: Pratt learned the practices from elders, his ancestors lived in Kalalau Valley, he took responsibility for the Valley, his purpose was not commercial, and his practices were consistent with custom. Dr. McGregor further opined that Pratt's residence in the valley is a traditional practice because it was necessary to fulfill his responsibilities to the land. McGregor testified that she believed these practices to be protected by Hawaiʻi law.

Mr. Wayne Souza, the Parks District Superintendent for Kauaʻi for the Department of Land and Natural Resources ("DLNR"), testified for the prosecution. He stated that the purpose of the park regulations is to limit the number of people permitted in the park for health and safety reasons, and to protect vulnerable park resources. Souza testified that controlling the number of visitors is necessary because the self-composting toilets fail when too many people visit. The regulations also limit the number of people who visit in order to keep the area "low density" to provide a wilderness experience, and to protect plant and animal life. He testified that the park is home to native plant communities and native sea birds. Souza also testified that the State has established a curatorship program to manage cultural and archaeological resources, like the heiau in Kalalau Valley. Under the program, a curator works with the DLNR and the State Historic Preservation Division to manage the sites.

Following the hearing, the parties submitted briefing on the issue of the native Hawaiian practices defense. In its brief, the State conceded the following:

In this case, based on Dr. Davianna Pomaikai McGregor's testimony, the State does

not dispute that the activities described are traditional and customary Native Hawaiian practices.

The State argued that, even if Pratt's conduct is a native Hawaiian practice, Pratt's right to engage in this practice is subject to the State's right to regulate. The State maintained that it is entitled to enforce its regulations restricting visitation of Kalalau Valley to protect the health and safety of the public, and to preserve the natural environment. The State also cited the curatorship program as an effort by the State to reconcile competing interests in managing the Park.

In his brief, Pratt contended that his motion to dismiss should be granted because he satisfied the three prongs of the *Hanapi* test.[8] Alternatively, Pratt argued that, while the State may regulate even customary and traditional practices, the State has the burden to prove that the regulation is reasonable and allows for the practice of native Hawaiian rights to the extent feasible. Pratt suggested that if the court applies a balancing test, that test should only permit the State to regulate if it shows that it would be "infeasible" to permit the native Hawaiian practice; Pratt argued that because the State has not made such a showing, the defense stands as a bar to conviction.

The trial court recognized that there was no dispute regarding whether Pratt satisfied the three prongs of the *Hanapi* test, but determined that further analysis was required. The trial court noted that the constitutional provision at issue explicitly states that the privilege is "subject to the right of the State to regulate such rights"; therefore the court determined that when a defendant claims a native Hawaiian privilege as a defense to criminal charges, the court must consider the State's interests in regulating the conduct. The trial court found that the State has a strong interest in controlling the Park, and that Pratt could exercise his rights within the boundaries of the law by obtaining permits to be in the park or applying to the

curatorship program. In sum, the court found:

> that the State has a valid interest in protecting and preserving this valuable asset [the park], which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship. This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

The trial court denied Pratt's motion to dismiss, and allowed the case to proceed to trial.

At trial, the parties stipulated to the essential facts sufficient to establish that Pratt had violated the Closed Areas regulation. The stipulation also permitted the trial court to treat the testimony from the hearing on the motion to dismiss as the testimony offered at trial. The document states the following:

> The STATE OF HAWAII and Defendant LLYOD [sic] PRATT stipulate that the following facts are true, accurate and correct.

> On July 14, 2004, July 28, 2004 and September 28, 2004, Lloyd Pratt was camping in Kalawao [sic] State Park.

> At each of the times that Lloyd Pratt was camping the Kalalau State Park location where he was camping was a closed area[.]

> Prior to each of the times when Lloyd Pratt camping [sic] in Kalalau State Park signs were posted stating that locations where Lloyd Pratt was camping was [sic] a closed area.

> Immediately prior to each of the times when camping, Lloyd Pratt, [sic] both saw the signs and had actual knowledge that the locations in Kalalau State Park where he was camping was [sic] a closed area.

> And that all times relevant, the entirety of Kalalau State Park was located in the County of Kauai, State of Hawaii.

> Additionally, the STATE OF HAWAII and LLYOD [sic] PRATT stipulate that the testimony contained in the November 4, 2005 transcript of proceedings shall be

---

**8.** Pratt also briefed a defense under the Federal Religious Freedom Restoration Act ("RFRA"), but that defense is not before this court.

deemed to have been given at trial and that any objections and rulings thereon shall be deemed to have been as set forth in that transcript. This stipulation shall not constitute a waiver of any of the objections to or claims of error that either the STATE OF HAWAII or LLYOD [sic] PRATT may choose assert [sic] with respect to any rulings on objections or other orders of court as set forth in said transcript.

In its closing argument the State reiterated its position that if its regulations are reasonable, then the native Hawaiian privilege does not exempt anyone from compliance with those regulations. Pratt presented multiple defenses: he reiterated his position that he had satisfied the *Hanapi* test, and he presented several other defenses, arguing that a conviction would violate the Federal Religious Freedom Restoration Act ("RFRA"), the ex post facto clauses of the federal and state constitutions, the rule of lenity, and stare decisis.[9]

The trial court convicted Pratt of violating the Closed Areas regulation. The trial court's order included the following Findings of Fact ("FOF") and Conclusions of Law ("COL"):

[FOF] 13. Based on the testimony elicited at the November 4 hearing and concessions made by the State in its brief, the Court finds that Mr. Pratt is [1] a native Hawaiian, [2] that he carried out customary or traditional native Hawaiian practices in Kalalau at the time of the camping, and [3] that this exercise of rights occurred on undeveloped or less than fully developed land.

[...]

[FOF] 16. At trial, the parties stipulated that the evidence and issues offered at the hearing on the Motion to Dismiss were deemed to have been introduced at trial.

[...]

[COL] 4. The rights of Native Hawaiians to engage in customary or traditional Native Hawaiian practices, carried out on

land that was undeveloped or less than fully developed, is not an absolute right, but is a right that needs to be balanced against the interest of the State of Hawaii in keeping the Kalalau State Park a wilderness area, protecting the area for all to enjoy, conserving park resources and providing for the health and safety of all who visit the area.

[...]

[COL] 6. DLNR Code LNR 13–146–04 is a reasonable regulation, both on its face and as applied to the heretofore described activities of Lloyd Pratt.

[...]

[COL] 8. The defendant satisfied all three prongs of the affirmative defense as set forth in *State v. Hanapi*.

[COL] 9. Case and statutory law all suggest that even with such a showing (under Hanapi), the Court must "reconcile competing interests," or stated another way "accommodate competing ... interests" and only uphold such rights and privileges "reasonably exercised" and "to the extent feasible" and "subject to the right of the State to regulate such rights." See Article XII, section 7, Hawaii Constitution; *Public Access Shoreline Hawai'i v. Hawaii County Planning Commission*, 79 Hawai'i 425 [903 P.2d 1246] (1995).

[COL] 10. The Court must balance the competing interests of Mr. Pratt's attempts to exercise certain Hawaiian native [sic] rights by setting up a residence and [heiau] in the Kalalau Valley with the State's interest in keeping this a wilderness area for all to enjoy and be safe in.

[COL] 11. The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship. This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

---

**9.** Pratt does not pursue any of these defenses on appeal, thus, this opinion does not fully articulate these arguments.

The court sentenced Pratt to 60 hours of community service, and stayed the sentence pending this appeal.

## B. The ICA's November 18, 2010 Opinion

Pratt appealed his conviction to the ICA. The three ICA judges produced three separate published opinions. *State v. Pratt*, 124 Hawai'i 329, 243 P.3d 289 (App.2010). Though they based their opinions on different reasoning, Judges Fujise and Leonard both concluded that Pratt's conviction should be affirmed. Chief Judge Nakamura concurred in part, but dissented from the portion of the opinion affirming Pratt's conviction. On December 17, 2010, the ICA filed its Judgment on Appeal. On March 15, 2011, Pratt filed a timely application for writ of certiorari. This court accepted Pratt's application on April 21, 2011 and heard oral argument on May 19, 2011.

## II. STANDARD OF REVIEW

■ Pratt asserts a constitutional right. "We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case. Thus, we review questions of constitutional law under the right/wrong standard." *Hanapi*, 89 Hawai'i at 182, 970 P.2d at 490 (quoting *State v. Mallan*, 86 Hawai'i 440, 443, 950 P.2d 178, 181 (1998)) (internal quotations marks and citations omitted).

## III. DISCUSSION

### A. The Court Will Not Exercise Plain Error Review To Invalidate The Parties' Stipulation At Trial.

■ In this case, as in any criminal case, the burden of proof falls on the prosecution to prove each element of the crime for which the defendant is charged. It is only after the prosecution meets this burden that any offered affirmative defense becomes relevant. In this case, Pratt stipulated to all the essential facts necessary to warrant conviction. Therefore, this court must affirm the judgment below convicting Pratt, unless Pratt can prove his defense that the privilege for native Hawaiian practices applies in his case.

The dissent argues that the court should exercise plain error review to invalidate Pratt's conviction on grounds not raised by counsel, namely, that the court may not accept the stipulation agreed upon by Pratt and the prosecution in this case. The dissent reasons that because there is no on-the-record colloquy in which Pratt waives his right to have the prosecution prove each element of the offense for which he was charged, and because Pratt and defense counsel contradicted the stipulation on record, the case must be remanded for a new trial. Dissent at 225–26, 277 P.3d at 319–20. The dissent cites as authority *State v. Murray*, 116 Hawai'i 3, 169 P.3d 955 (2007), a case which had not been decided at the time of Pratt's trial.

We respectfully disagree with the dissent's position for several reasons. First, we note that the timing of the stipulation and Pratt's testimony indicate that the stipulation reflected a tactical decision not to dispute whether the prosecution satisfied its burden to secure conviction. The first step of Pratt's defense was to file a motion to dismiss, grounded in his affirmative defense that his activities in the park were protected as traditional and customary native Hawaiian practices, and that such protection precluded conviction. The District Court held a hearing on Pratt's motion on November 4, 2005. It was during this hearing that Pratt testified that he had not seen any "Closed Area" signs in the park. Following further briefing on the defense, the court issued an order denying Pratt's motion on March 10, 2006, and the case was scheduled for trial. Prior to trial on April 12, 2006, the parties executed a stipulation to satisfy the essential facts of the offense, thus narrowing the issues for trial to Pratt's several affirmative defenses. Pratt signed the stipulation, as did defense counsel and the prosecution.

The dissent would negate the parties' April 2006 stipulation, in part due to Pratt's November 2005 testimony that he did not see any of the posted signs in the park. However, the subsequent stipulation indicates that, at trial, the defense made a tactical decision to focus its energy on affirmative defenses, rather than disputing the prosecution's prima

facie case.[10] The dissent would also negate the stipulation because the record does not include any physical evidence of the signs. However, the absence of evidence to prove an element to which the opposing party has stipulated is to be expected; having executed the stipulation, the prosecution did not present its case in chief at trial.

The dissent cites *State v. Murray* as authority for discarding the stipulation. In *Murray*, the defendant was on trial for Abuse of a Family or Household Member. 116 Hawai'i at 5, 169 P.3d at 957. More specifically, prosecutors sought conviction under a subsection of the statute for defendants convicted of a "third or any subsequent offense that occurs within two years of a second or subsequent conviction." *Id.* In a motion in limine, defense counsel stipulated to the prior abuse convictions; this stipulation was read aloud to the jury at trial. *Id.* On writ, the court considered whether this stipulation was in error because it was "made solely by counsel." *Id.* at 6, 169 P.3d at 958. The court concluded that Murray was entitled to a new trial because his counsel was not permitted to make this stipulation without Murray's consent. *Id.* at 14, 169 P.3d at 966. For support, the court cited *State v. Ibuos*, 75 Haw. 118, 121, 857 P.2d 576, 578 (1993) for the proposition that "A knowing and voluntary waiver [. . .] must come directly from a defendant, *either in writing or orally.*" *Id.* at 10, 169 P.3d at 962 (emphasis added). The court explained the requirement that the waiver be on the record, reasoning that "[w]ithout such a record it is difficult to determine whether the defendant personally waived such a right." *Id.* at 12, 169 P.3d at 964.

This main concern informing *Murray* is not present in Pratt's case because Pratt is on the record as personally admitting to the essential facts supporting conviction. The record in this case contains a written stipulation, signed by Pratt himself. With respect, we do not believe that the court should exercise plain error review to retroactively apply

*Murray* when the concern addressed by *Murray* is not a factor. *See, e.g., State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74 (1993) ("This court's power to deal with plain error is one to be exercised sparingly and with caution. . . ."). Furthermore, the contradictions on the record from Pratt's testimony were offered prior to the stipulation, and the fact that the record does not contain evidence of the signs is not unexpected, as the prosecution secured Pratt's admission before having an opportunity to present its case in chief. For these reasons, we disagree with the dissent, and give effect to the parties' stipulation.

## B. The Courts Below Did Not Err In Utilizing A Balancing Test Or In Concluding That The Balancing Test In This Case Favors The State.

The first question presented by Pratt's application requires the court to consider whether it was proper for the trial court and ICA to undertake a balancing test after Pratt satisfied the three-factor *Hanapi* test. We hold that it was, as explained below.

### 1. The Privilege For Native Hawaiian Practices Requires The Finder Of Fact To Balance Competing Interests.

The privilege afforded for native Hawaiian practices, as expressed in our State constitution and statute, is not absolute. The language of the provisions protecting customary native Hawaiian practices display a textual commitment to preserving the practices while remaining mindful of competing interests. For example, the constitutional language protecting the right to traditional and customary practices is qualified by the phrase "subject to the right of the State to regulate such rights." As a second example, HRS § 7-1, a statute protecting gathering rights, provides that native Hawaiians may gather traditional plants, but specifically exempts from protection the gathering of these items for commercial purposes.

---

10. The dissent cites *Briones v. State*, 74 Haw. 442, 848 P.2d 966 (1993), for support of its argument that declining to refute the charges can not be tactical because it did not have an "obvious basis" in benefitting Pratt. Dissent at 222– 23 n. 4, 277 P.3d at 316–17 n. 4. Respectfully, this argument takes a myopic view of Pratt's case. From the very beginning, Pratt sought to establish a constitutional privilege to camp or reside in Kalalau Valley without a permit.

In our previous cases, this court has interpreted the constitutional and statutory language as requiring consideration of the facts and circumstances surrounding the conduct. Chief Justice Richardson explored this balance in *Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1, 656 P.2d 745 (1982). The plaintiff in that case, William Kalipi, owned a taro patch in the Manawai ahupua'a and an adjoining houselot in Ohia ahupua'a, on the island of Moloka'i. *Kalipi*, 66 Haw. at 3, 656 P.2d at 747. He lived in a nearby ahupua'a called Keawenui. *Id.* For years, Kalipi and his family had entered Manawai and Ohia to gather ti leaf, bamboo, kukui nuts, kiawe, medicinal herbs, and ferns. *Id.* at 4, 656 P.2d at 747. When the Hawaiian Trust Company refused him the access to which he was accustomed, Kalipi brought suit alleging that he had a right to enter the property to gather the items as he wished. *Id.* Chief Justice Richardson's opinion acknowledged the tension between modern concepts of land ownership and native Hawaiian gathering rights. He explained that "any argument for the extinguishing of traditional rights based simply upon the possible inconsistency of purported native rights with our modern system of land tenure must fail." *Id.* at 4, 656 P.2d at 748. Similarly, the court implicitly recognized that the bare assertion of this privilege is inadequate to defeat all property rights. That is, the two conceptions of property must coexist somehow, and the court saw its task as:

> to conform these traditional rights born of a culture which knew little of the rigid exclusivity associated with the private ownership of land, with a modern system of land tenure in which the right of an owner to exclude is perceived to be an integral part of fee simple title.

*Id.* at 7, 656 P.2d at 749. The court in *Kalipi* "struck" a "balance" in its interpretation of HRS § 7–1, which at the time of the *Kalipi* opinion stated:

> Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, housetimber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and water-courses, which individuals have made for their own use.

*Id.*, HRS § 7–1 (1976).[11] In construing this statute, the court articulated two standards: one for developed land, and one for undeveloped land. *Id.* at 8, 656 P.2d at 750. The court held that there is no right to exercise native Hawaiian practices on developed land because it "would so conflict with understandings of property, and potentially lead to such disruption, that we could not consider it anything short of absurd and therefore other than that which was intended by the statute's framers." *Id.* at 8–9, 656 P.2d at 750. Second, for undeveloped land, the court instructed that land use should be determined on a *case by case basis,* and that traditional rights "should in each case be determined by *balancing the respective interests and harm* once it is established that the application of the custom has continued in a particular area." *Id.* at 10, 656 P.2d at 751 (emphasis added). In Kalipi's case, the court did not proceed to the balancing test because it held that the statutory provisions he cited did not protect the rights of non-residents of an ahupua'a. *Id.* at 9, 12, 656 P.2d at 750, 752.

Kalipi also cited HRS § 1–1 as a source of his right of entry. At the time of Kalipi's case, that statute provided:

> The common law of England, as ascertained by English and American decisions, is declared to be the common law of the State of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the State, or fixed by Ha-

---

11. The current version of the statute includes two small modifications: the word "housetimber" is now written as "house-timber," and the word "water-courses" is now written as "water-courses." HRS § 7–1 (2009).

waiian judicial precedent, or established by Hawaiian usage.... HRS § 1–1 (1955).[12] The court determined that this provision sought to permit native Hawaiian practices "which did not unreasonably interfere with the spirit of the common law." 66 Haw. at 10, 656 P.2d at 751. The court again held that the practice must be considered on a case by case basis. This court has since read *Kalipi* as "merely informing us that the *balance of interests and harms* clearly favors a right of exclusion for private property owners as against persons pursuing non-traditional practices or exercising otherwise valid customary rights in an unreasonable manner." *PASH*, 79 Hawai'i at 442, 903 P.2d at 1263 (emphasis added).

Following *Kalipi*, the next main case to consider native Hawaiian rights was *Pele Defense Fund v. Paty* ("*PDF* "), 73 Haw. 578, 837 P.2d 1247 (1992). In that case, PDF, a non-profit corporation whose stated purpose is to perpetuate Hawaiian religion and culture, challenged the constitutionality of a land transfer in which the State traded public land, including the Wao Kele 'O Puna Natural Area Reserve, in exchange for land that had been privately held. *Id.* at 584, 837 P.2d at 1253. PDF asserted, among other claims, that the transfer violated Article XII, § 7 of the State constitution because it denied access into Wao Kele 'O Puna for PDF members who wished to exercise their traditional practices. *Id.* at 613, 837 P.2d at 1268. In analyzing this claim, this court first distinguished the residency requirement holding of *Kalipi* because Kalipi's claims had been based on a claim of ownership, while PDF's claims were constitutional and founded in custom. *Id.* at 618–19, 837 P.2d at 1271. After determining that the constitutional provision at issue was intended to protect "the broadest possible spectrum of native rights," the court held that it may protect rights that extend beyond the ahupua'a of residence because the purpose of Article XII, § 7 was to reaffirm "*all* rights customarily and traditionally held by ancient Hawaiians." *Id.* at 619–20, 837 P.2d at 1271–72 (emphasis in original). The court limited practices on others' ahupua'a to situations "where such rights

have been customarily and traditionally exercised in this manner." *Id.* at 620, 837 P.2d at 1272. The court remanded, and wrote that in addition to proving that the practice is traditional and customary, PDF must also show that it meets "the other requirements of *Kalipi.*" *Id.* at 621, 837 P.2d at 1272.

In a subsequent case, *PASH*, this court identified the "other requirements" as referring to the requirements that the land be undeveloped and that the activity cause no actual harm. *PASH*, 79 Hawai'i 425, 439–40, 903 P.2d 1246, 1260–61. The question presented in *PASH* was whether Public Access Shoreline Hawai'i, a public interest organization, had standing to participate in a contested land use case hearing regarding a proposed development on the island of Hawai'i. *Id.* at 429, 903 P.2d at 1250. This court held that the group had standing to participate in such a hearing, and proceeded to articulate the constitutional analysis for the case on remand. *Id.* at 435, 903 P.2d at 1256. First, the court noted that the constitutional protection is not absolute; it only protects the "reasonable" exercise of native Hawaiian rights. *Id.* at 442, 903 P.2d at 1263. Then, the court pointed out that the constitution gives the State the "power to regulate the exercise of customarily and traditionally exercised Hawaiian rights," and that the same provision obligates the State to protect the exercise of those rights "to the extent feasible." *Id.* at 450 n. 43, 903 P.2d at 1271 n. 43.

A common thread tying all these cases together is an attempt to balance the protections afforded to native Hawaiians in the State, while also considering countervailing interests. In the criminal context, one countervailing interest of particular importance, and explicitly stated in the constitutional provision, is "the right of the State to regulate such rights." In the first case examining the native Hawaiian privilege as a defense to a criminal conviction, *State v. Hanapi*, Alapai Hanapi was convicted of trespass after he entered his neighbor's land to observe the restoration of the Kihaloko and Waihilahila fishponds. 89 Hawai'i 177, 178, 970 P.2d 485, 486 (1998). Hanapi argued that his trespass was constitutionally protected because he

---

12. This exact statute remains in effect. HRS § 1–1 (1999).

went to the property to "perform our religious and traditional ceremonies of healing the land" and "to make sure that restoration was done properly." *Id.* at 181, 970 P.2d at 489. The court articulated the three-point test, holding that a criminal defendant asserting this privilege as a defense to criminal charges must, "at minimum", prove the following: (1) the defendant must be "native Hawaiian" according to the criteria established in *PASH* [13], (2) the claimed right must be "constitutionally protected as a customary or traditional native Hawaiian practice," and (3) the conduct must occur on undeveloped property. *Id.* at 185–86, 970 P.2d at 493–94. The court affirmed Hanapi's conviction, holding that Hanapi did not satisfy his burden to prove that he was engaged in a traditional practice while on his neighbor's land. *Id.* at 187, 970 P.2d at 495.

2. *In Balancing Interests, The Court Must Consider The Totality Of The Circumstances.*

All four of the Judges to consider Pratt's case have agreed that once a criminal defendant satisfies the three-prong showing required by *Hanapi*, there remains a balancing test before the defendant's assertion of the native Hawaiian privilege negates any possible criminal conviction. They have, however, differed in their views of what factors the test should consider. The trial court reached the following conclusions of law in its articulation of the balancing test:

[COL] 9. Case and statutory law all suggest that even with such a showing (under *Hanapi*), the Court must "reconcile competing interests," or stated another way "accommodate competing ... interests" and only uphold such rights and privileges "reasonably exercised" and "to the extent feasible" and "subject to the right of the State to regulate such rights." See Article XII, section 7, Hawaii Constitution; *Public Access Shoreline Hawai'i v. Hawaii County Planning Commission*, 79 Hawai'i 425 [903 P.2d 1246] (1995).

[COL] 10. The Court must balance the competing interests of Mr. Pratt's at-

tempts to exercise certain Hawaiian native [sic] rights by setting up a residence and [heiau] in the Kalalau Valley with the State's interest in keeping this a wilderness area for all to enjoy and be safe in. [COL] 11. The Court finds that the State has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with this stewardship. This interest when balanced against the rights expounded by Mr. Pratt weigh in favor of the State.

Thus, it appears that the trial court considered the defendant's stated intention, balanced against the State's offered legislative prerogatives.

At the ICA, Judge Leonard's opinion concluded that the balancing test in this case weighed in favor of the State, in part because there was no evidence that the State's regulation was unreasonable. *Pratt* at 356, 243 P.3d at 316. This articulation of the balancing test necessarily places a burden of proof on the defendant to show unreasonableness of the regulation. Judge Fujise likewise placed the burden of proof on the defendant, but articulated the test as requiring the defendant to show the reasonableness of his conduct under the circumstances. *Id.* at 357, 243 P.3d at 317. Chief Judge Nakamura contended that the State carries the burden of proof to show that the defendant's conduct resulted in actual harm. *Id.* at 363–64, 243 P.3d at 323–24.

We respectfully decline Chief Judge Nakamura's articulation of the test, finding the test to be too narrow. The facts of this case provide apt illustration. The harm against which the park's regulation seeks to protect is the harm caused by too many visitors in Kalalau Valley; by definition, one person could never cause that harm. But this does not mean that the government may not seek to protect against overuse. In fact, user permits are a common and effective government tool in situations where outlawing the threatening activity is not necessary, but

---

13. *PASH* defines "native Hawaiians" as "descendants of native Hawaiians who inhabited the islands prior to 1778[.]" *PASH*, 79 Hawai'i 425, 449, 903 P.2d 1246, 1270 (1995).

where the government seeks to control against overuse of a limited resource.

We likewise reject the other ICA Judges' articulations of the test because of this court's practice of applying totality of the circumstances tests, as opposed to legal presumptions, in the context of native Hawaiian rights. For example, in *Kalipi*, the plaintiff asserted that HRS § 1-1 established certain native Hawaiian customary rights as the law of the State. *Kalipi* at 9, 656 P.2d at 750. In response, the defendants contended that any rights that may have been retained had been abrogated by an early case suggesting that HRS § 7-1 contained an exhaustive list of native Hawaiian rights, and that all other customary practices could be freely regulated by the State. *Id.* Finding the plaintiff's contention too broad and the defendants' too narrow, this court rejected both views, stating, "[r]ather, we believe that the retention of a Hawaiian tradition should in each case be determined by *balancing the respective interests and harm* once it is established that the application of the custom has continued in a particular area." *Id.* at 10, 656 P.2d at 751 (emphasis added). This court has since interpreted *Kalipi* as "informing us that the *balance of interests and harms* clearly favors a right of exclusion for private property owners as against persons pursuing non-traditional practices or exercising otherwise valid customary rights in an unreasonable manner." *PASH*, 79 Hawaiʻi at 442, 903 P.2d at 1263.

Likewise, in *PDF*, the court acknowledged the balancing requirement implicit in the constitutional language, writing that the provision both "reaffirm[ed] customarily and traditionally exercised rights of native Hawaiians, *while giving the State the power to regulate these rights.*" *PDF* at 619, 837 P.2d at 1271 (emphasis added). Then, after determining that non-residence was not a bar to plaintiffs' claims of a native Hawaiian right, the court wrote,

> If it can be shown that Wao Kele ʻO Puna was a traditional gathering area utilized by the tenants of the abutting ahupuaʻa, and that the other requirements of *Kalipi* are met in this case, then PDF members such as Ms. Naeole *may* have a right to enter

the undeveloped areas of the exchanged lands to exercise their traditional practices.

*Id.* at 621, 837 P.2d at 1272 (emphasis added). In using the word "may"—as opposed to "must"—the court left room for the courts to implement the constitutional language by considering all the circumstances of the case on remand.

The importance of considering the totality of circumstances is also reflected in this court's discussion of developed and undeveloped lands in *Hanapi*. There, the court reiterated *PASH*'s holding that it is "*always* 'inconsistent' to permit the practice of traditional and customary native Hawaiian rights on such [developed] property. In accordance with *PASH*, however, we reserve the question as to the status of native Hawaiian rights on property that is 'less than fully developed.'" *Hanapi* at 187, 970 P.2d at 495 (quoting *PASH* at 450, 903 P.2d at 1271). The court refused to validate a bright-line test whereby native Hawaiian practices on undeveloped lands are always permitted.

The dissent argues against utilizing a totality of the circumstances test in this context, in part because "settled criteria" already exist. Dissent at 229, 277 P.3d at 323. It further argues that a totality of the circumstances test is "imprecise" and "invites consideration of matters beyond the benchmarks." Dissent at 229, 277 P.3d at 323. We disagree with each of these points. First, as explained above, we read the cases cited in this opinion as underscoring the importance of the court's careful judgment in resolving cases involving traditional and customary native Hawaiian rights; we do not read them as providing a limited set of "settled criteria" to evaluate in every case. Second, we do not share the dissent's concerns that the court should avoid utilizing a totality of the circumstances test because it is "imprecise." Rather, we note that it is the very flexibility ensured by this test that makes it appropriate to use in this context. Review of this jurisdiction's cases involving native Hawaiian practices shows how varied the scenarios are in which native Hawaiian rights arise. Because the constitutional provision at issue applies in several contexts, and because we cannot anticipate which factors may

be relevant in all contexts, we decline to articulate a test that could preclude consideration of important factors.

■ In applying the totality of the circumstances test to the facts of this case, the balancing of interests weighs in favor of permitting the park to regulate Pratt's activity, his argument of privilege notwithstanding.

Souza testified that the regulation serves several important purposes. The DLNR manages the park so "people can have a wilderness type of experience." He described the Kalalau Valley as "one of the most scenic areas," and noted that it is "rich in cultural resources," including native plant communities and native sea birds. He testified that the DLNR requires visitors to obtain permits in an effort to limit visitors for health and safety reasons, and to protect park resources. One concern is that the self-composting toilets fail when they are over-used, another is that they must keep the area "low density" to protect the fragile ecosystem.

The record also shows that Pratt has an interest in going to Kalalau Valley. As the ICA wrote, "Pratt clearly cares for and feels a spiritual connection to Kalalau and the ancient Hawaiians that once occupied the valley." *Pratt* at 351, 243 P.3d at 311. Pratt is a kahu; he has studied native Hawaiian practices and goes to the valley as part of his practice.

However, according to his testimony, his actions in Kalalau Valley go beyond stewardship. Pratt testified that he took care of some of the heiau, but also that he established a residence in Kalalau Valley, and cleared entire areas of the valley in order to replant them with other species. He undertook this work without consultation with the DLNR, and without an effort to comply with the DLNR's permit requirements. Aside from an unsuccessful application to work with the DLNR in the 1990s, Pratt did not show any attempts to engage in his native Hawaiian practice within the limits of state law.

In this case, the trial court did not err in considering all of the facts and circumstances surrounding Pratt's activities, and then balancing the parties' interests. While Pratt has a strong interest in visiting Kalalau Valley, he did not attempt to visit in accordance with the laws of the State. Those laws serve important purposes, including maintaining the park for public use and preserving the environment of the park. The outcome of this case should not be seen as preventing Pratt from going to the Kalalau Valley; Pratt may go and stay overnight whenever he obtains the proper permit. He may also apply to the curatorship program to work together with the DLNR to take care of the heiau in the Kalalau Valley. The trial court did not err in determining that Pratt's interest in conducting his activities without a permit did not outweigh the State's interest in limiting the number of visitors to Kalalau Valley; Pratt's activities, therefore, do not fall under constitutional protection.

As always in a criminal case, the prosecution bears the burden of proving the defendant guilty of the charged offense. In this case, Pratt admitted to violating the regulation at issue: he stipulated that he was in a closed area of Kalalau State Park on the three dates of his citations. Therefore, this court must affirm Pratt's convictions for violating HAR § 13–146–4.

## IV. CONCLUSION

As explained above, we affirm the December 17, 2010 Judgment of the ICA, which affirmed the District Court of the Fifth Circuit's June 16, 2006 Judgments convicting Pratt of violating HAR § 13–146–4.

Concurring and Dissenting Opinion by ACOBA, J., with whom McKENNA, J., Joins.

I write separately for three reasons. First, I would vacate the conviction of Petitioner/Defendant–Appellant Lloyd Pratt (Petitioner) and remand for a new trial because, based on plain error, the record reveals serious questions about whether there was sufficient evidence to convict and whether Petitioner knowingly and voluntarily waived his right to have Respondent/Plaintiff–Appellee the State of Hawai'i (Respondent or the

State) prove each element of the offense beyond a reasonable doubt.

Second, in my view, to establish the defense that conduct is constitutionally protected as a native Hawaiian activity, a defendant must also demonstrate that his or her conduct was reasonable; additionally, I would not require courts to use a "totality of the circumstances" test required by the majority as this test is unnecessary and invites consideration of matters beyond the established benchmarks set forth in *State v. Hanapi*, 89 Hawai'i 177, 970 P.2d 485 (1998). Third, I believe that on appeal Judge Leonard had the right to review Respondent's concession that Petitioner's activities were traditional and customary Native Hawaiian practices because that issue was germane to the application of *Hanapi* and article XII, section 7 of the Hawai'i Constitution,[1] and as judges we exercise our own independent judgment on constitutional questions based on the facts of the case.

### I.

Regarding the first reason, Petitioner was convicted of the offense of "Closed Area," Hawai'i Administrative Rules (HAR) Rule § 13–146–4. He ostensibly stipulated to facts that would satisfy the elements of the offense. However, his testimony at court proceedings and his counsel's statement in oral argument contradicted the stipulation, calling into serious question whether there was substantial evidence to support the conviction. Additionally, there is no indication in the record that Petitioner understood that, by so stipulating, he was waiving his right to have Respondent prove each element of the offense beyond a reasonable doubt. It was plain error for Petitioner not to have raised this on appeal. Additionally, that violation rendered the stipulation entered into between Petitioner and Respondent inequitable and unfairly prejudicial. Accordingly, I would vacate the judgment of conviction filed

by the court and remand the case for a new trial.

### A.

Petitioner was cited on July 14, July 28, and September 28, 2004, for the offense of "closed area" at Kalalau State Park (the park), in violation of HAR § 13–146–4. HAR § 13–146–4 provides in relevant part as follows:

§ 13–146–4 Closing of areas. (a) The board or its authorized representative *may establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof,* when necessary for the protection of the area or the safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure. *All persons shall observe and abide by the officially posted signs designating closed areas and visiting hours.*

(Emphases added.)

On September 21, 2005, Petitioner filed a Motion to Dismiss (Motion), arguing that at the times he was cited, he was engaged in constitutionally protected activity under article XII, section 7 of the Hawai'i Constitution. Petitioner maintained that his activity was protected as a native Hawaiian right under *Hanapi*, 89 Hawai'i at 177, 970 P.2d at 485, which requires a defendant asserting the right to establish the following three factors: (1) that he or she "qualify[ies] as a 'native Hawaiian[,]' " i.e., persons who are " 'descendants of native Hawaiians who inhabited the islands prior to 1778,' and who assert otherwise valid customary and traditional Hawaiian rights [ ] entitled to constitutional protection regardless of their blood quantum[,]" *id.* at 185–86, 970 P.2d at 493–94 (quoting *Public Access Shoreline Hawaii v. Hawai'i Cnty. Planning Comm'n (PASH )*, 79 Hawai'i 425, 449, 903 P.2d 1246, 1270 (1995)), (2) the "claimed right is constitutionally protected as a customary or traditional native Hawaiian

---

1. Article XII, section 7 of the Hawai'i Constitution provides:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and

possessed by ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

practice[,]" *id.*, and (3) "the exercise of the right occurred on undeveloped or 'less than fully developed property[,]' " *id.* (quoting *PASH*, 79 Hawai'i at 450, 903 P.2d at 1271).

A hearing was held on Petitioner's Motion on November 4, 2005. On March 10, 2006, the court issued an order denying the Motion. The court concluded that Petitioner had satisfied the three prongs of *Hanapi*. However, the court noted that, in addition, the court must uphold the right only if "reasonably exercised" and only to the "to the extent feasible[.]" (Citing *PASH*, 79 Hawai'i at 442, 451, 903 P.2d at 1263, 1272.) (Internal quotation marks omitted.) The court ultimately decided that Respondent's interest in protecting and preserving the park outweighed Petitioner's interest in exercising his rights under the Hawai'i Constitution.

### B.

Prior to trial, on April 12, 2006, Respondent and Petitioner stipulated to the following facts: (1) "On July 14, 2004, July 28, 2004 and September 28, 2004, [Petitioner] was camping in [Kalalau State Park (the park)"; (2) "At each of the times that [Petitioner] was camping[,] *the . . . location where he was camping was a closed area*"; (3) "Prior to each of the times when [Petitioner was] camping in [the park,] *signs were posted stating that the locations where [Petitioner] was camping was a closed area*"; and (4) "*Immediately prior to each of the times when camping, [Petitioner] both saw the signs and had actual knowledge that the locations in [the park] where he was camping was a closed area.*" (Emphases added.)

At trial, Respondent stated to the court at the outset, "At the risk of shocking you this is going to be probably one of the shorter matters today." The court responded, "No I'm not shocked at all. . . . *[R]eally, the whole crux of this is the appellate issue that I have on the motion that I denied.* And [ ] I assumed that we probably wouldn't even have a trial, . . . and that any sentence . . . would be stayed pending appeal[.]" (Emphasis added.) Respondent replied, "It's a trial on stipulated facts[.] . . . [T]he [c]ourt just makes a finding on the stipulated facts. *And then . . . it's a very clear appellate record.*"

(Emphasis added.) Respondent further related that, in light of the stipulated facts, there is "a very clear violation on its face, and I don't think that they're disputing it" so "*[t]he issue is really [the] PASH defense.*" (Emphasis added.) Respondent and defense counsel then presented their arguments regarding Petitioner's defenses, including that Petitioner had engaged in constitutionally protected activity.

### C.

Following trial, on May 15, 2006, the court entered its Findings of Facts (findings) and Conclusions of Law (conclusions). The court entered the following relevant findings:

1. *On July 14, 2004, July 23, 2004, and September 28, 2004, [Petitioner] camped in [the park].*

2. *On said dates, [the park] location where [Petitioner] was camping was a closed area. Signs were posted stating [the park] location where [Petitioner] was camping was a closed area.*

3. *[Petitioner] saw the signs and had actual knowledge that the location in [the park] where he was camping was a closed area.*

4. On said dates, [the park] was located in the County of Kauai, State of Hawai'i.

5. *During this period of time [Petitioner] did not have a permit to camp in [the park].*

6. *[HAR § ] 13–146–04 prohibits certain types of camping without a permit in Hawai'i State Parks.*

7. *On July 14, 2004, July 28, 2004 and July 28, 2004 [Petitioner] was camping without a permit in [the park] within the meaning of [HAR § ] 13–146–04.*

8. *[Petitioner] was charged with [sic] three separate criminal cases for camping without a permit based on his camping at [the park].*

9. [Petitioner] filed a Motion to Dismiss based on his assertion, among other things, that his activities were constitutionally protected customary and traditional native Hawaiian Practices.

10. [Petitioner's] Motion to Dismiss also asserted the defense of privilege base on [*Hanapi*, 89 Hawai'i 177, 970 P.2d at 485].

11. A full evidentiary hearing was held on November 4, 2005, at which time [Petitioner] testified and also offered Dr. Davianna McGregor as an expert witness in Hawai'i cultural and traditional practices. Wayne Souza, Parks District Superintendent for Kauai for the [DLNR], testified for [Respondent].

. . .

13. *Based on the testimony elicited at the November 4 hearing and concessions made by [Respondent] in its brief, the Court finds that Petitioner is [ (1) ] a native Hawaiian, [ (2) ] that he carried out customary or traditional native Hawai'i practices in Kalalau at the time of the camping, and [ (3) ] that his exercise of rights occurred on undeveloped or less than fully developed land.*

. . .

15. The Court denied [Petitioner's] Motion to Dismiss by written opinion on February 20, 2006 and ordered the case to proceed to trial.

16. At trial, the parties stipulated that the evidence and issues offered at the hearing on the Motion to Dismiss were deemed to have been introduced at trial.

. . .

18. [At trial, Petitioner argued that he] . . . had established that his conduct was privileged under the three-part test in [*Hanapi* ] and based on the Hawai'i Constitution.

. . .

The court entered the following relevant conclusions:

3. [Respondent] has an interest in keeping the [park] a wilderness area, to protect the area for all to enjoy, conserve park resources and provide for the health and safety of all who visit the area.

. . .

5. In furthering these interests, [Respondent] has the right to promulgate reasonable regulations restricting the number of persons in the [park] at any given time, the length or duration of individuals being

in the [park], the amount of traffic in [the park] and the activities undertaken with the [park].

. . .

7. *On July 14, 2004, July 28, 2004 and September 28, 2004, [Petitioner] violated [HAR § ] 13–147–4 and is guilty as charged in cases HC04–147, HC04–169 and HC04–229.*

8. *[Petitioner] satisfied all three prongs of the affirmative defense as set forth in [Hanapi].*

. . .

11. This Court finds that [Respondent] has a valid interest in protecting and preserving this valuable asset, which means, among other things, controlling the amount of traffic, the length of stay for any one person, and the types of activities that are consistent with stewardship. This interest when balanced against the rights expounded by [Petitioner] weigh in favor of [Respondent].

(Brackets omitted; emphases added.)

## II.

### A.

Our penal code establishes that "[a] defense is a fact or set of facts which negatives penal liability." HRS § 701–115 (1993). Thus, before any defense may be considered by the trier of fact, the trier of fact must first determine that all elements of the offense have been established beyond a reasonable doubt. *State v. Miyashiro*, 90 Hawai'i 489, 500–01, 979 P.2d 85, 96–97 (App.1999) (concluding that the court's failure to "instruct the jury that it was required to unanimously agree that all elements of the charged offenses had been established beyond a reasonable doubt before considering the entrapment defense" was error because the jurors may have concluded "that if they failed to reach agreement as to the affirmative defense of entrapment, they were required to return a guilty verdict, even if they had not unanimously determined whether the prosecution had established all the elements of the charged offenses beyond a reasonable doubt"). The right to have the prosecution

prove each element beyond a reasonable doubt is both statutorily[2] and constitutionally[3] guaranteed. *State v. Murray*, 116 Hawai'i 3, 10, 169 P.3d 955, 962 (2007); *see also State v. Lima*, 64 Haw. 470, 474, 643 P.2d 536, 539 (1982) ("It is well established, as a precept of constitutional as well as statutory law, that an accused in a criminal case can only be convicted upon proof by the prosecution of every element of the crime charged beyond a reasonable doubt.") (Citations omitted.)

### B.

HAR § 13–146–4(a) permits the Department of Land and Natural Resources (the board) "or its authorized representative" to "establish a reasonable schedule of visiting hours for all or portions of the premises and close or restrict the public use of all or any portion thereof, when necessary for the protection of the area or safety and welfare of persons or property, by the posting of appropriate signs indicating the extent and scope of closure." HAR § 13–146–4(a) further mandates that "[a]ll persons [ ] observe and abide by the officially posted signs designating closed areas and visiting hours."

In order to convict a person under HAR § 13–146–4(a), then, Respondent was required to prove beyond a reasonable doubt that (1) there was an "officially posted sign[,]" (2) that "designat[ed]" the area in which Petitioner was cited as a "closed area[,]" (3) the "signs indicat[ed] th[e] extent and scope of closure[,]" and (4) Respondent did not "abide by" the directives on the signs.

### C.

At the heart of any criminal case is the question of whether the prosecution has met its burden of establishing each element of the charged offense beyond a reasonable doubt. Here, the record is silent as to whether Petitioner understood he had such a right or that Petitioner knowingly waived this right. For example, although Petitioner stipulated to having camped in a "closed area"; that "signs were posted stating that the locations where [Petitioner] was camping [were] closed area[s]"; and that he "saw the signs and had actual knowledge that the locations in [the park] where he was camping [were] closed area[s]"; Petitioner contradicted these matters at the hearing on his Motion. When asked, "In the area that you're alleged to illegally be, do you know of any signs that say what hours you can and can't be there?" Petitioner answered, "No." Petitioner was also asked whether he knew "of any signs regulating the entry times" "in the area." Again, Petitioner answered, "No."

At oral argument before us, it was noted that Petitioner had stipulated that he was in a closed area but that it was unclear whether Petitioner "was actually in a closed area[.]" Oral Argument, Hawai'i Supreme Court, at 10:22–11:17 (May 19, 2011), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc27897.html. Petitioner's counsel was asked, "Was he in a closed area?" and, "What did the signs say?" *Id.* Counsel responded that he did not "remember any evidence of any signs." *Id.* at 11:31–35. Additionally, counsel observed that this was "the first time the issue ha[d] been raised" and revealed that "he did not believe there was any evidence in the record that [it] was a closed" area. *Id.* at 12:56–13:36. This directly contradicts the facts to which Petitioner stipulated.

Respectfully, the parties' and the court's focus appears to have been on fashioning a record for a "test case" to obtain an appellate ruling on the constitutional defense issue.[4]

---

**2.** HRS § 701–114 (1993) provides:

(1) Except as otherwise provided in section 701–115, no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:

    (a) *Each element of the offense* [.]

(Emphasis added.)

**3.** The due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution mandate that the prosecution prove every element of the charged crime beyond a reasonable doubt. *See State v. Maelega*, 80 Hawai'i 172, 178, 907 P.2d 758, 764 (1995).

**4.** The majority contends that the timing of the stipulation and Petitioner's testimony indicate that the stipulation reflected a "tactical decision" not to dispute whether the prosecution satisfied its burden. *See* majority opinion at 212, 213, 277 P.3d at 306, 306. However, as noted, at the

The court convicted Petitioner of violating HAR § 13–146–4(a) without any assurance that Petitioner personally understood that the stipulation amounted to a waiver of Petitioner's right to have the prosecution adduce evidence establishing each element of the offense beyond a reasonable doubt. This apparent lack of attention to the elements of HAR § 13–146–4(a) is further reflected in the court's findings and conclusions. For example, the court characterized HAR § 13–146–4(a) as "prohibit[ing] certain types of camping without a permit in Hawai'i State Park[.]" Finding 6. The court additionally found that on the various dates at issue, Petitioner "was camping without a permit in [the park] within the meaning of [HAR § ] 13–146[–4]. Finding 7. But, as discussed, Petitioner was cited for being in a "closed area," and HAR § 13–146–4(a) allows the DLNR to "close or restrict" areas of public parks "by the posting of appropriate signs indicating the extent and scope of closure" and mandates that "[a]ll persons [ ] observe and abide by the officially posted signs designating closed areas and visiting hours."

Thus, the ordinance under which Petitioner was cited, charged, and convicted does not prohibit camping without a permit, but penalizes one who fails to abide by officially posted signs designating an area as closed. The record, insofar as Petitioner testified that he was not aware of, and did not observe, any signs indicating that the areas in which he was cited were "closed areas," as well as appellate counsel's acknowledgment that he did not believe there was any evidence adduced regarding that element, raises serious questions as to whether there were any officially posted signs indicating the park or any area thereof was a "closed area," what the alleged signs actually said, and whether Petitioner failed to abide by the information on the alleged signs.

### III.

In light of the contradictions noted *supra,* sufficient evidence is lacking to support Petitioner's conviction for violation of HAR § 13–146–4. "The test on appeal in reviewing the legal sufficiency of the evidence is whether, when viewing the evidence in the light most favorable to the prosecution, substantial evidence exists to support the conclusion of the trier of fact." *State v. Bui,* 104 Hawai'i 462, 467, 92 P.3d 471, 476 (2004) (quoting *State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995)). " 'Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to reach a conclusion.' " *Id.* (quoting *State v. Silva,* 75 Haw. 419, 432, 864 P.2d 583, 590 (1993)).

In addition to the inconsistency between Petitioner's testimony at trial and the stipu-

---

earlier hearing on his Motion, Petitioner contradicted the matters to which he later stipulated. The fact that the contents of the stipulation were contrary to Petitioner's earlier testimony at the hearing would seem to render the subsequent stipulation all the more suspect, and suggests that Petitioner's waiver was not tactical. Although the majority states that the "contradictions on the record from [Petitioner's] testimony were offered prior to the stipulation," *see* majority opinion at 213, 277 P.3d at 307, the contradiction in the record arises *from* the stipulation, because the contents of the stipulation are inconsistent with Petitioner's prior testimony and with his counsel's statements on certiorari. In any event, in oral argument on certiorari, Petitioner's counsel confirmed *after the stipulation was made* that it was "unclear" whether Petitioner was "actually in a closed area[,]" thus contradicting the stipulation.

Moreover, if "an action or omission of trial counsel has no obvious basis for benefitting a defendant's case[,]" it not considered tactical or

strategic. *See Briones v. State,* 74 Haw. 442, 463, 848 P.2d 966, 976 (1993) ("Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny.... If, however, the action or omission had no obvious basis for benefitting defendant's case and it 'resulted in the withdrawal or substantial impairment of a potentially meritorious defense,' then the knowledge held and investigation performed by counsel in pursuit of an informed decision will be evaluated as that information that, in light of the complexity of the law and the factual circumstances, an ordinarily competent criminal attorney should have had.") (citation omitted). This is not a narrow view but the applicable law. Here, the decision to enter into the stipulation purportedly admitting liability did not appear to have "an obvious basis for benefitting [Petitioner's] case[,]" and in light of the inconsistencies in this case may have " 'resulted in the withdrawal or substantial impairment of a meritorious defense[.]' " *See id.* (citation omitted).

lation, and counsel's admission that there was no evidence presented regarding signs indicating that Petitioner was in a "closed area," Respondent acknowledged that the factual record in this case was not developed. *See* Oral Argument, Hawai'i Supreme Court, at 23:17–23:24. (May 19, 2011), *available at* http://www.courts.state.hi.us/courts/oral_arguments/archive/oasc27897.html (stating at that the "factual issues in this case were not flushed out sufficiently"). Respondent noted that there are "fundamental factual issues" in this case[,]" *id.* at 23:27–29, including where exactly Petitioner was in the park when he was cited, "where [ ] the delineated camp grounds" are, and whether the "entire valley [is] closed" because the area is traditionally open "for camping at the shoreline during the summer months." *Id.* at 23:31–23:48. "These issues were not flushed out[,]" Respondent stated. *Id.* at 23:51–54.

It was noted that Respondent stipulated that this was a "closed area[,]" a "closed area" is defined by the regulations as "a place that is off-limits[,]" and so under the facts of this case, "a native Hawaiian kahu cannot go to the [area in which Petitioner was cited]." *Id.* at 23:56–24:16. Respondent, however, conceded that "on this record, it's unclear" because the area in which Petitioner was cited is not "off-limits" but "camping in the [area] is off-limits." *Id.* at 24:17–35. In addition, Respondent indicated that its understanding is that the area in which Petitioner was cited is at least "open for hiking" but "it's not that you cannot step foot in the area." *Id.* at 25:43–56. Respondent acknowledged that although this court was deciding the constitutional criminal defense, the "record wasn't very well developed[,]" and the facts were not "flushed out in the record." *Id.* at 24:36–46, 25:56–58.

In light of Respondent's answers, there is no reasonable basis for "viewing the evidence in the light most favorable to the prosecution." *Bui*, 104 Hawai'i at 467, 92 P.3d at 476 (internal quotation marks and citation omitted). In any event, here, the evidence was not credible. "Credibility" is " 'the quality that makes something (a witness or some evidence) worthy of belief[.]' " *State v. Walsh*, 125 Hawai'i 271, 298, 260 P.3d 350, 377 (2011) (quoting *Black's Law Dictionary* 423 (9th ed. 2009)). Although Petitioner and Respondent stipulated that Petitioner was in a "closed area" when he was cited, Respondent apparently acknowledged at oral argument that the area was not "closed" as defined by the regulations. Moreover, although Petitioner stipulated that there were signs indicating that the area was closed, his own testimony contradicted the existence of such signs. In addition, his counsel stated that no evidence regarding signs or its content were admitted into evidence. Thus, the evidence purportedly supporting Petitioner's conviction in this case, including the stipulation, lacks qualities making it worthy of belief. *Id.* In turn, because the evidence cannot be reasonably believed, with respect to proving the elements of the offense, it cannot be said to be of sufficient probative value to support conviction. *See Black's Law Dictionary* at 638 (defining "probative evidence" as "[e]vidence that tends to prove or disprove a point at issue").

Finally, a person of reasonable "caution" is one who uses "prudent forethought to minimize risk." *Merriam Webster* at 182. In light of the foregoing, a person could not reasonably conclude that the elements had been proven beyond a reasonable doubt. Furthermore, a prudent person could not accept these circumstances as minimizing the risk that the conviction was wrong. Thus, the evidence would not enable a reasonably cautious person to conclude that Petitioner was guilty of the offense. *State v. Maldonado*, 108 Hawai'i 436, 442, 121 P.3d 901, 907 (2005). Vacation of the conviction is thus required.[5]

5. *See State v. Puaoi*, 78 Hawai'i 185, 191, 891 P.2d 272, 278 (1995) (noting that a "conviction cannot be supported where there is no evidence to establish a material element of the offense charged beyond a reasonable doubt[,]" and "[a] conviction based on insufficient evidence of any element of the offense charged is a violation of due process and thus constitutes plain error");

*see also State v. Hirayasu*, 71 Haw. 587, 589, 801 P.2d 25, 26 (1990) (concluding that there was insufficient evidence to support Appellant's conviction, and noting that "although Appellant did not raise the issue of sufficiency of the evidence, 'the power to sua sponte notice plain errors or defects affecting substantial rights clearly resides in this court' ") (quoting *State v. Hernandez*, 61

## IV.

Whether Petitioner's waiver of his right to have Respondent prove each element of the offense beyond a reasonable doubt was knowing and voluntary must also be called into question. As stated in *Murray*, "many defendants may not know that they have a right to have all elements proven beyond a reasonable doubt" or that a stipulation to elements "must be objected to during trial or the right to object may be lost." *Murray*, 116 Hawai'i at 13–14, 169 P.3d at 965–966. Thus, where a defendant waives this constitutional right, we have a duty to conduct an independent review of the record to ensure such right was not violated. *See State v. Staley*, 91 Hawai'i 275, 277, 982 P.2d 904, 906 (1999) ("[A]lthough not asserted ... as a point of error on appeal, we hold, based on our independent review of the record, that [the defendant's] constitutional right to testify was violated."); *see also State v. Waiau*, 60 Haw. 93, 97, 588 P.2d 412, 415 (1978) (stating that "the interests of justice require that appellant have a means of escape from the position in which he was improperly induced to place himself in this case").

### A.

*Murray* foresaw that, where a defendant stipulates to elements of an offense, it may be difficult to determine on appeal whether the defendant knowingly and voluntarily waived his right to have each element proven beyond a reasonable doubt. 116 Hawai'i at 12, 169 P.3d at 964. *Murray* explained that prior cases in this jurisdiction establish that a defendant's waiver of a fundamental right must be knowing and voluntary, and must come directly from the defendant. *Id.* at 10, 169 P.3d at 962 (citing *State v. Ibuos*, 75 Haw. 118, 121, 857 P.2d 576, 578 (1993)). *Murray* noted that in *Tachibana v. State*, this court held " 'that in order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defen-

Haw. 475, 482, 605 P.2d 75, 79 (1980) (internal quotation marks omitted)); *State v. Lee*, 90 Hawai'i 130, 135, 976 P.2d 444, 449 (App.1999) (noting that the prosecution's failure to offer evidence in support of an element of the offense "would rise to the level of plain error").

dants of their right to testify and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify.' " *Id.* at 11, 169 P.3d at 963 (quoting *Tachibana v. State*, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995)); *cf. State v. Lewis*, 94 Hawai'i 292, 294–95, 12 P.3d 1233, 1235–36 (2000) (explaining that although the colloquy requirement to establish the knowing and voluntary nature of a defendant's waiver of his or her right to testify is not implicated where a defendant chooses to testify, where the defendant chooses to testify, the court must inform the defendant of his or her right to testify or not to testify, and ensure that the defendant's decision is his or her "own decision").

As pointed out by *Murray*, 116 Hawai'i at 10, 169 P.3d at 962, trial courts in this state are required to engage in on-the-record colloquies with criminal defendants when the waiver of other fundamental rights are at issue. *See, e.g., State v. Kupau*, 76 Hawai'i 387, 395–96 n. 13, 879 P.2d 492, 500–01 n. 13 (1994) (right to included offense instructions); *Ibuos*, 75 Haw. at 121, 857 P.2d at 578 (right to trial by jury); *State v. Vares*, 71 Haw. 617, 622–23, 801 P.2d 555, 558 (1990) (right to counsel); *Conner v. State*, 9 Haw.App. 122, 126, 826 P.2d 440, 442–43 (1992) (entry of guilty plea). In light of the foregoing, *Murray* held that a defendant may not be deemed to have waived his or her right to have the prosecution prove each element beyond a reasonable doubt unless the trial court engages in an on-the-record colloquy with the defendant ensuring that the defendant has knowingly and voluntarily waived such a right. *Murray*, 116 Hawai'i at 12, 169 P.3d at 964.

Here, as noted, the record reveals that both Petitioner and his counsel contradicted the stipulation of facts which underlay his conviction. Indisputably, there has been no valid *Murray* waiver via an on-the-record colloquy in this case.[6] Consequently, it can-

6. The majority states that Petitioner made "a tactical decision to focus on affirmative defenses, rather than "disputing" the prosecution's prima facie case." Majority opinion at 213, 277 P.3d at 306. In light of the record, it would not appear this strategy had an "obvious basis for benefitting [Petitioner's] case." *Briones*, 74 Haw. at

not be demonstrated that Petitioner understood his right to have Respondent prove each element of the offense beyond a reasonable doubt, and that he knowingly and voluntarily waived that right. *See Murray*, 116 Hawai'i at 11–12, 169 P.3d at 963–64.

The majority contends, however, that the "main concern informing *Murray* is not present in [this] case because [Petitioner] is on the record as personally admitting to the essential facts supporting conviction." Majority opinion at 213, 277 P.3d at 307. However, the "main concern" of *Murray* was not to ensure that the defendant in that case, rather than his counsel, stipulated to the convictions; instead, it was to ensure that the defendant understood that by stipulating to his prior convictions he was waiving his right to have the prosecution prove his prior convictions beyond a reasonable doubt in court. 116 Hawai'i at 12, 169 P.3d at 964 ("[A] colloquy between the trial court and the defendant is the best way to ensure that a defendant's constitutional right such as waiver of proof of an element is protected, and that the defendant has *knowingly and voluntarily waived such a right.*") (emphasis added). Thus, *Murray* held that the court must engage in a colloquy "to ensure a defendant's right is knowingly and voluntarily waived." *Murray* 116 Hawai'i at 11, 169 P.3d at 963.

Here, the court did not engage in a colloquy to ensure Petitioner understood that he was giving up the right to have the prosecution prove every element of the offense by entering into a stipulation. The majority

nevertheless suggests that it can be assumed that Petitioner, by personally signing the written stipulation, also understood that he was waiving his rights. *See* majority opinion at 213, 277 P.3d at 307. But this is not a legitimate assumption to draw. The stipulation did not set forth the rights Petitioner was waiving. Thus, in the absence of an on-the-record colloquy, Petitioner's conviction cannot stand. *See Murray*, 116 Hawai'i at 14, 169 P.3d at 966 (remanding for a new trial because "the court did not engage [defendant] in a colloquy regarding waiving proof of an element of the charge).[7]

### B.

Petitioner was tried and convicted before this court issued its opinion in *Murray*. However, *Murray* was decided while Petitioner's case was pending on appeal before the ICA. Defense counsel should have brought *Murray* to the attention of the ICA. *See* Hawai'i Rules of Appellate Procedure Rule (HRAP) 28(j) (2011) ("Parties may, by letter to the appellate clerk, bring to the appellate court's attention *pertinent and significant authorities published after a party's brief has been filed, but before a decision*") (emphasis added). Defense counsel also could have raised *Murray* in his Application.

Despite defense counsel's failure to bring *Murray* to the attention of the ICA and this court, we may *sua sponte* notice plain error infringing on a defendant's constitutional rights.[8] *State v. Miller*, 122 Hawai'i 92, 123,

463, 848 P.2d at 976. Also, with all due respect, the majority shifts the burden from the prosecution to the defense. Petitioner does not have to "disputing" the prosecution's case. Instead, the prosecution's burden to prove every element of the offense with which Petitioner was charged beyond a reasonable doubt remains consistent even in the face of an affirmative defense. *Murray*, 116 Hawai'i at 10, 169 P.3d at 962; *see also Miyashiro*, 90 Hawai'i at 498, 979 P.2d at 94.

7. In this case, both counsel and Petitioner signed the stipulation. Presumably, in *Murray*, counsel stipulated to the defendant's prior convictions with the consent of the defendant. Respectfully, the distinction that Petitioner signed the stipulation, relied upon by the majority, *see* majority opinion at 213, 277 P.3d at 307, is immaterial. The question is not whether Petitioner himself or

his counsel signed the stipulation but, rather, whether Petitioner understood the *implication* of the stipulation *as waiving his constitutional rights*. Plainly, there is nothing in the record that would support such an understanding by Petitioner.

8. The majority states that the "power to deal with plain error is one to be exercised sparingly and with caution." Majority opinion at 213, 277 P.3d at 307. I do not suggest the power to notice plain error is unrestrained. *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 75 (1993) ("[W]here plain error has been committed and substantial rights have been affected thereby, the error may be noticed even though it was not brought to the attention of the trial court."). This case warrants plain error review because, in the absence of a colloquy, Petitioner cannot be presumed to have knowingly and voluntarily

223 P.3d 157, 188 (2010); *see also State v. Heapy*, 113 Hawai'i 283, 305, 151 P.3d 764, 786 (2007) ("noting that "[a]ppellate courts, in criminal cases, may *sua sponte* 'notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings'") (quoting *State v. Fox*, 70 Haw. 46, 56, 760 P.2d 670, 675–76 (1988)); *State v. Mahoe*, 89 Hawai'i 284, 972 P.2d 287 (1998) (stating that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court" and, thus, noticing error infringing on the defendant's "constitutional rights to due process and unanimous jury verdict ... [a]lthough not raised by [the defendant] on appeal"); *State v. Richie*, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (stating that although the alleged statutory violation "was not raised below and was not included in the point of error section of [the defendant's] opening brief" this court may "address it *sua sponte* ... despite the failure of trial counsel and appellate counsel to properly raise this issue[,]" because this court has reviewed such violations for plain error in that past"); *Hirayasu*, 71 Haw. at 589, 801 P.2d at 26 (stating that, "although Appellant did not raise the issue of sufficiency of the evidence, 'the power to *sua sponte* notice plain errors or defects affecting substantial rights clearly resides in this court'") (quoting *Hernandez*, 61 Haw. at 482, 605 P.2d at 79) (internal quotation marks omitted); *accord State v. Grindles*, 70 Haw. 528, 530, 777 P.2d 1187, 1189 (1989). In *Murray*, the defendant failed to object to the stipulation entered by counsel, and we nevertheless held the stipulation was invalid in the absence of a colloquy. 116 Hawai'i at 13, 169 P.3d at 965. This case and *Murray* are indistinguishable, and there is no reason to follow a different course here.

---

waived his *constitutional* right to have the prosecution prove every element of the charged offense. To hold otherwise would "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *State v. Nichols*, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006).

9. Although the parties agreed in this case to certain facts, where constitutional rights are at stake, the court is duty bound, even in the ab-

**C.**

In assessing whether Petitioner's constitutional right was violated, this court has an obligation to independently review the record. *See Staley*, 91 Hawai'i 275, 277, 982 P.2d 904, 906 (1999) (concluding based on this court's independent review of the record that the defendant's constitutional right to testify was violated); *see also State v. Hicks*, 113 Hawai'i 60, 70, 148 P.3d 493, 503 (2006) (" 'We answer questions of constitutional law by exercising our own independent constitutional judgment based on the facts of the case.' " (Quoting *State v. Friedman*, 93 Hawai'i 63, 67, 996 P.2d 268, 272 (2000).)); *Cf. Hanapi*, 89 Hawai'i at 182, 970 P.2d at 490 (noting that this court "answer[s] questions of constitutional law by exercising [ ] independent constitutional judgment based on the facts of the case" under the right/wrong standard).[9]

With respect to the record, based on the stipulation, the court concluded that "[o]n July 14, 2004, July 28, 2004 and September 28, 2004, [Petitioner] violated [HAR § ] 13–147–4 and is guilty as charged in cases HC04–147, HC04–169 and HC04–229." Conclusion 7. The parties' agreement as to a legal conclusion is not binding on this court. *Beclar Corp. v. Young*, 7 Haw.App. 183, 190, 750 P.2d 934, 938) (App.1988) (stating that "the parties' agreement on the question of law is not binding on us"); *see also Assoc. of Apartment Owners of Newtown Meadows ex rel. its Bd. of Dirs. v. Venture 15, Inc.*, 115 Hawai'i 232, 254, 167 P.3d 225, 247 (2007) (stating that this court is not bound by the parties' concession of law). This court reviews conclusions of law de novo. *Hicks*, 113 Hawai'i at 70, 148 P.3d at 503 ("A trial court's conclusions of law, however, are reviewed de novo, under the right/wrong standard of review.").

---

sence of a request or acquiescence of any party, to scrutinize the stipulation to assess whether it is appropriate and supported by the record. *Cf. In re Doe*, 90 Hawai'i 200, 211, 978 P.2d 166, 177 (stating that "before he or she approves of and orders a settlement agreement into effect, a family court judge is duty bound, independent of the request or acquiescence of any party, to scrutinize the settlement agreement for the purpose of determining whether it is appropriate and enforceable").

Furthermore, " '[a] stipulation in and of itself may be set aside if it was 'made inadvertently, unadvisedly or improvidently' and 'will operate inequitably and to the prejudice of one of the parties, provided all parties may be placed in the condition in which they were before the stipulation was made.' " *In re Doe*, 90 Hawai'i at 211, 978 P.2d at 177 (App.1999) (quoting *State v. Foster*, 44 Haw. 403, 423, 354 P.2d 960, 971 (1960)) (ellipsis and other citations omitted); *accord Murray*, 116 Hawai'i at 13, 169 P.3d at 965. Petitioner himself testified that he was not aware of, or did not observe, any signs indicating that the areas in which he was cited were "closed areas[.]" His appellate counsel acknowledged during oral argument that there was no evidence in the record that the areas in which Petitioner was cited were closed areas. Respondent agreed that, based on the record, it is unclear whether Petitioner was in a "closed area" as defined by the regulation. These facts plainly undermine the stipulation, and thus, also, conclusion 7.[10] Consequently, based on the record, the stipulation was inadvertent, unadvised, or improvident. Because Respondent had the burden of establishing the elements of HAR § 13–146–4 beyond a reasonable doubt, the stipulation would "operate inequitably and to the prejudice of [Petitioner]" because the record does not indicate Petitioner understood the implication of his stipulation. The stipulation, then, must be deemed invalid. *Murray*, 116 Hawai'i at 13, 169 P.3d at 965. Accordingly, Petitioner's conviction must be vacated and the case remanded for a new trial.

### IV.

### A.

Regarding the second reason, while Petitioner's conviction should be vacated, I reach the first question raised by Petitioner of whether "the defense of privilege pursuant to article XII, section 7 of the Hawai'i Constitution require[s] a balancing of the reasonableness of [Petitioner's] conduct against [Respondent's] right to regulate[,]" because the majority addresses it.[11] As held by this court in *Hanapi*, 89 Hawai'i at 185–86, 970 P.2d at 493–94, where a defendant asserts that the conduct for which he or she was charged is constitutionally protected under article XII, section 7, the defendant must prove the three factors previously referred to, see *supra*.

In addition, only " 'the *reasonable* exercise of ancient Hawaiian usage is entitled to protection under article XII, section 7.' " *Hanapi*, 89 Hawai'i at 184, 970 P.2d at 492 (quoting *PASH*, 79 Hawai'i at 442, 903 P.2d at 1263) (emphasis in original). Thus, in my view a defendant bears the burden of proving that the three *Hanapi* factors have been satisfied *and* that his or her exercise of rights under article XII, section 7 was reasonable. Although not discussed by the majority, inasmuch as the defendant bears the burden of demonstrating that his or her conduct is constitutionally protected, and only a reasonable exercise of a defendant's article XII, section 7 right is entitled to protection, a defendant must demonstrate that his or her conduct was reasonable in addition to satisfying the three-prong test set forth in *Hanapi*.

### B.

Also, I respectfully disagree with the majority's conclusion that, in balancing the respective interests of native Hawaiians and the State's interest in regulating those rights, the court must consider the "totality

---

10. The majority contends that the absence of evidence to prove this element "is to be expected" because, "having executed the stipulation, the prosecution did not present its case in chief at trial." *See* majority opinion at 213, 277 P.3d at 307. For the reasons mentioned before, whether the prosecution did so or not, the conviction cannot be sustained based on our review because of a lack of substantial evidence. Assuming, *arguendo*, that the record does not contain evidence due to the stipulation, this only underscores the need for a colloquy. To ensure that a defendant understands that the prosecution has the burden of producing evidence to prove each element of the offense, and that stipulating to facts will result in a waiver of that right makes the colloquy all the more essential.

11. I concur in the majority's holding that the constitutional defense asserted by Petitioner in this case is governed by the test set forth in *Hanapi*, 89 Hawai'i at 185–86, 970 P.2d at 493–94.

of the circumstances." As explained, *supra*, the current *Hanapi* test sets out benchmarks for the defense. The court must identify the respective interests of the defendant and the State and balance those interests to determine which is of greater weight. These benchmarks are to be applied in every case, and whether they have been met is necessarily dependent on the facts of the particular case.

However, introducing the concept of "totality of the circumstances" when there are already settled criteria in *Hanapi* renders the *Hanapi* test imprecise and invites consideration of matters beyond the benchmarks. "Totality of the circumstances" connotes something broader than consideration of the relevant criteria which are already to be supported by the facts in each case. For that reason, adding a "totality of the circumstances" gloss to the existing benchmarks risks expanding the scope of analysis to include extraneous matters that may adversely affect the integrity of the test outcome. *See State v. Ketchum*, 97 Hawai'i 107, 133, 34 P.3d 1006, 1032 (2001) (Acoba, J., concurring and dissenting) (stating that the "totality of circumstances test . . . is unnecessary and only invites confusion, not clarity").

The majority disagrees, stating that it does not read *Kalipi v. Hawaiian Trust Co., Ltd.*, 66 Haw. 1, 656 P.2d 745(182), *Pele Defense Fund*, 73 Haw. 578, 837 P.2d 1247, *PASH*, 79 Hawai'i 425, 903 P.2d 1246, and *Hanapi*, 89 Hawai'i 177, 970 P.2d 485, as establishing settled criteria for courts to follow. However, although the majority on the one hand states that the cases do not establish a constitutional test with settled criteria, *see* majority opinion at 217, 277 P.3d at 311, the majority itself derives from these cases a test that incorporates the *Hanapi* factors and balances the interests of defendants against the State, and, on more than one occasion, refers to these as a "three-factor *Hanapi* test" and a "balancing test." Majority opinion at 213, 215–16, 277 P.3d at 307, 309–10.

Along the same lines, the majority claims that it reads the cases as underscoring the importance of the court's "careful judgment" in resolving cases involving Traditional and Customary Native Hawaiian rights. Majority opinion at 217, 277 P.3d at 311. But this theory finds no support in the cases themselves, for the cases make no mention of the court's "careful judgment" to determine whether a defendant can assert as a defense that the conduct for which he or she was charged is constitutionally protected as a native Hawaiian right. *Id.* Presumably, in all cases the courts will exercise their functions judiciously and thus use "careful judgment." Balancing contending interests, such as the protections afforded to native Hawaiians against the interests of the State is standard fare for the courts. Respectfully, like the totality of the circumstances gloss, a "careful judgment" standard adds little elucidation or guidance in applying the *Hanapi* test. More appropriately, in *Hanapi*, this court reviewed the questions at issue, whether the defendant was exercising a constitutionally protected right at the time of his arrest, and whether the defendant had adduced sufficient evidence to establish the constitutional defense, under the right/wrong standard and the substantial evidence standard, respectively.[12] *Hanapi*, 89 Hawai'i at 182, 970 P.2d at 490.

Lastly, the majority contends that it is necessary to adopt the totality of the circumstances test because it is "flexib[le]" and will allow the court to take into account "varied [ ] scenarios." Majority opinion at 217, 277 P.3d at 311. However, what matters is not whether the test is "flexib[le]" or whether it

---

12. In *Hanapi*, this court also explained that to establish the existence of a traditional or customary native Hawaiian practice, there must be an adequate foundation in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice. 89 Hawai'i at 187, 970 P.2d at 495. The determination of whether a proper foundation has been laid is discretionary with the court. *See State v. Loa*, 83 Hawai'i 335, 348, 926 P.2d 1258, 1271 (1996) (" 'When a question arises regarding necessary foundation for introduction of evidence, determination of whether proper foundation has been established lies within discretion of trial court, and its determination will not be overturned absent showing of clear abuse.' " (Quoting *State v. Joseph*, 77 Hawai'i 235, 239, 883 P.2d 657, 661 (App.1994).)) However, the dispute in this case does not concern whether Petitioner laid the proper foundation, but rather whether the court was correct to balance Petitioner's interests against those of the State.

fits many scenarios, but whether it establishes rational criteria that allow the court to apply the law governing the constitutional defense to the facts of a particular case.[13]

Respectfully, the majority's own analysis illustrates that the totality of the circumstances test is both unnecessary and confusing. The majority purports to apply the totality of the circumstances test to the facts of this case, but, in reality, all it does is to approve of the court's "consider[ation of] all of the facts and circumstances surrounding [Petitioner's] activities, and [its] balance[ing of] the parties' interests," *see* majority opinion at 218, 277 P.3d at 312. How injecting the totality of the circumstances test into the analysis would assist the court is not apparent.

V.

Regarding the third reason, as noted, *supra*, the second question raised by Petitioner is whether the ICA could review Respondent's concession[14] that Petitioner had engaged in traditional and customary Native Hawaiian practices. Because I would vacate and remand the case for a new trial, this question is addressed.

As noted, Respondent conceded in its brief that Petitioner had engaged in traditional and customary native Hawaiian activities. However, concessions do not bind the parties. *Cf. State v. Line*, 121 Hawai'i 74, 79, 214 P.3d 613, 618 (2009) ("[A] confession of

error by the prosecution is not binding upon an appellate court"). Nevertheless, the court incorporated the terms of the concession into finding 13 [15] and conclusion 8 [16], concluding that Petitioner satisfied the three *Hanapi* factors. On appeal, Judge Leonard, in the lead opinion of the ICA, reviewed whether Petitioner met the three *Hanapi* factors even though that issue was not contested by the parties. Judge Leonard reasoned that Respondent's concession did not relieve the ICA from its obligation to exercise its own independent judgment on the constitutional question of whether Petitioner satisfied the test in *Hanapi*. *Pratt*, 124 Hawai'i at 349 n. 19, 243 P.3d at 309 n. 19. The two other judges on the panel disagreed and would not have reviewed the court's ruling that Petitioner satisfied the three *Hanapi* prongs. *Id.* at 357, 243 P.3d at 317 (Fujise, J., concurring); *id.* at 358, 243 P.3d at 318 (Nakamura, C.J., concurring and dissenting). Petitioner contends that it was improper for Judge Leonard to review whether Petitioner satisfied the three *Hanapi* factors because Respondent had conceded that point and Petitioner was not given notice or an opportunity to brief the question.

Nevertheless, it is axiomatic that, if challenged, an appellate court may review findings of fact under the clearly erroneous standard and conclusions of law de novo. *State v. Okumura*, 78 Hawai'i 383, 391–92, 894 P.2d 80, 88–89 (1995).[17] In this case, finding 13

13. Similarly, although the majority suggests that if we do not adopt its totality of the circumstances test, courts will be precluded from considering "important factors," *see* majority opinion at 217, 277 P.3d at 311, the majority does not articulate which "important" factors will be missed or overlooked.

14. Respondent made the following concession in its "Post–Hearing Memorandum in Opposition to Defendant's Motion to Dismiss," filed on January 4, 2006, after the court held its November 4, 2005 hearing to determine whether Petitioner's activities were constitutionally protected: "In this case, based on Dr. Davianna Pomaikai McGregor's testimony, the State does not dispute that the activities described are traditional and customary Native Hawaiian practices."

15. Finding 13 provides:
Based on the testimony elicited at the November 4 hearing and concessions made by [Re-

spondent] in its brief, the Court finds that Petitioner is [(1)] a native Hawaiian, [(2)] that *he carried out customary or traditional native Hawai'i practices in Kalalau at the time of the camping,* and [(3)] that his exercise of rights occurred on undeveloped or less than fully developed land.
(Emphasis added.)

16. Conclusion 8 provides:
[Petitioner] satisfied all three prongs of the affirmative defense as set forth in [*Hanapi*].

17. Insofar as finding 13 may be viewed as a mixed question of law and fact, there does not appear to be universal agreement among jurisdictions as to what standard should apply. *See* 9C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2589 at 27400–01 (2011) (*Wright & Miller*) ("There is no uniform standard for reviewing mixed ques-

and conclusion 8 were not challenged. Ordinarily, an error not objected to in a criminal case will be deemed waived on appeal, unless the defendant's substantial rights are affected, in which case the error may be noticed on appeal if it is plain. *Miller*, 122 Hawai'i at 100, 223 P.3d at 160; Hawai'i Rules of Penal Procedure (HRPP) Rule 52 [18]. Here, however, the court's finding and conclusion benefitted Petitioner. Since Petitioner benefitted from the concession in this case, as set forth in finding 13 and conclusion 8, his substantial rights were not affected, and therefore there was no plain error to review.

Nevertheless, the question of whether Petitioner's activities were traditional and customary native Hawaiian practices, under article XII, section 7, as manifested in Respondent's concession and the court's finding 13 and conclusion 8, is of constitutional import. *Hanapi*, 89 Hawai'i at 184, 970 P.2d at 492. Appellate courts answer questions of constitutional law by exercising their own judgment. *See id.* at 182, 980 P.2d at 490 ("We answer questions of constitutional law by exercising our own *independent* constitutional judgment based on

the facts of the case[.]") (Emphasis added.) Thus, it was proper for Judge Leonard to consider whether Petitioner's activities were traditional and native Hawaiian practices, if she chose to, because that issue was germane to the application of article XII, section 7.

Further, an appellate court or judge is empowered to review constitutional questions if justice requires it, even if the issue is not raised by the parties. *Fujioka v. Kam*, 55 Haw. 7, 9, 514 P.2d 568, 570 (1973) (considering argument not raised before the circuit court that statute was unconstitutional because "an appellate court may … hear new legal arguments when justice so requires."); *State v. Ildefonso*, 72 Haw. 573, 584–85, 827 P.2d 648, 655 (1992) (declining to hear a constitutional challenge not raised but recognizing that this court has addressed issues raised for the first time on appeal where the constitutionality of the statute is of great public import and justice required consideration of the issue).[19] Thus, Judge Leonard was not required to accept what she deemed to be an erroneous proposition of law that was embodied in finding 13 and conclusion 8,

---

tions of law and fact."). It is apparent that this jurisdiction employs the clearly erroneous standard when reviewing mixed questions. However, reviewing the factual portion of a mixed question for clear error and the legal portion de novo is more consistent with our jurisprudence, *see Okumura*, 78 Hawai'i at 391–92, 894 P.2d at 88–89. This standard would respect the comparative advantages of trial courts and appellate courts, for it is axiomatic that "appellate courts must constantly have in mind that their function is not to decide factual issues de novo[,]" *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Briones*, 74 Haw. at 465, 848 P.2d at 977 ("Appellate courts neither find facts … nor judge credibility, nor weigh the evidence."); whereas it is for appellate courts to "hear and determine all questions of law, or of mixed law and fact," HRS § 602–5(1).

Many jurisdictions review mixed questions by evaluating the factual portion under the clearly erroneous standard and the legal portion of the question de novo. *See In re Omega Protein, Inc.*, 548 F.3d 361, 368 (5th Cir.2008) (in context of mixed questions of law and fact, the court of appeals should reverse only if "findings are based on a misunderstanding of the law or a clearly erroneous view of the facts"); *Nelson–Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 (4th Cir.2002) ("[I]n considering mixed questions of law and fact, we review the factual

portion of the inquiry for clear error and the legal conclusions de novo."); *Reich v. Lancaster*, 55 F.3d 1034, 1044 (5th Cir.1995) (reviewing "factual conclusions for clear error [ ] and examining de novo the court's legal conclusion drawn from the facts"). This approach would be consistent with the division of functions between trial and appellate courts that underlie our present approach and therefore would cause less disruption to our system of judging.

18. Rule 52. HARMLESS ERROR AND PLAIN ERROR.

(a) Harmless error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

19. An appellate court's inherent power to do justice is also reflected in several statutory provisions. Specifically, HRS § 602–57 (1993) provides that the ICA "shall have concurrent jurisdiction with the supreme court on all matters set out in section 602–5(1) through (7).…" HRS § 602–5(7) empowers this court and the ICA "[t]o make and award such judgments, decrees, orders and mandates … and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or *for the promotion of justice in matters pending before it.*" (Emphasis added.)

232

inasmuch as that proposition was central to the question the ICA was asked to decide: whether Pratt's conduct was constitutionally protected and exempt from prosecution.

Judge Leonard was not joined by her colleagues in reviewing Respondent's concession. Nevertheless, it was her prerogative to review the concession in order to perform her judicial function as she saw fit. "[There is] no more appropriate avenue for the discharge of [ ] *individual* judicial obligations [ ] than [ ] the written opinion. The choice and wisdom of exercising that prerogative must rest with each [judge] and no [judge] should shirk from exercising that judicial prerogative or be deterred by any veiled attempt to muzzle such expression." *In re Attorney's Fees of Mohr*, 97 Hawai'i 1, 16, 32 P.3d 647, 662 (2001) (Acoba, J., concurring in part and dissenting in part) (emphasis in original). The independence of a judge on each court must be preserved, as must the independence of the judiciary in general.

## VI.

For these reasons, I respectfully dissent in part.